UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

RINDA TUCKER,                        )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        No. 2:21-cv-00087-JAW
                                     )
LANTMÄNNEN UNIBAKE USA, INC.,        )
                                     )
                Defendant.           )

**ORDER ON LANTMÄNNEN UNIBAKE USA, INC.'S MOTION FOR SUMMARY JUDGMENT**

Addressing an exhaustively detailed and contentious record, the Court grants in part and denies in part an employer's motion for summary judgment in an employment dispute. The Court denies the employer's motion as to the employee's claims of sex and age discrimination under the Maine Human Rights Act but grants its motion as to her negligent misrepresentation and breach of contract claims.

## I.    BACKGROUND

On January 15, 2021, Rinda Tucker, a former employee of Lantmännen Unibake USA, Inc. (Lantmännen), filed a civil action in Maine Superior Court for York County against Lantmännen, alleging Lantmännen engaged in gender and age discrimination in violation of Maine law. *Notice of Removal*, Attach. 1, *Pl.'s Compl. for Gender and Age Discrimination* (ECF No. 1) (*Compl.*). On March 29, 2021, Lantmännen removed the case to federal court, asserting diversity-based jurisdiction. *Notice of Removal* (ECF No. 1). The parties proceeded with discovery, and after several extensions, discovery lapsed on May 31, 2022. *Order* (ECF No. 29).

On August 10, 2022, in anticipation of filing a motion for summary judgment, Lantmännen filed a Stipulated Record.  *Index for Jt. R. in Support of Def.'s Mot. for Summ. J.* (ECF No. 44) (*Stipulated R.*).  On August 16, 2022, Lantmännen filed its own record, *Def.'s R.* (ECF No. 46) (*Def.'s R.*), and, on September 8, 2022, Lantmännen filed a supplemental record.  *Index of Def.'s Suppl. R. in Support of Def.'s Mot. for Summ. J.* (ECF No. 52) (*Def.'s Suppl. R.*).

On September 12, 2022, Lantmännen filed its motion for summary judgment and statement of material facts.  *Def.'s Mot. for Summ. J.* (ECF No. 54) (*Def.'s Mot.*); *Def.'s Local R. 56(b) Supporting Statement of Material Facts* (ECF No. 53) (DSMF).  On October 12, 2022, Ms. Tucker filed a Local Rule 56(h) record, including affidavits and exhibits, *Index for Jt. R. in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 55) (*Pl.'s R.*), and she responded to Lantmännen's statement of material facts.  *Pl.'s Opp'n to Def.'s Statement of Material Facts* (ECF No. 57) (PRDSMF).  On October 13, 2023, Ms. Tucker filed a response to Lantmännen's motion for summary judgment.  *Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 60) (*Pl.'s Opp'n*).  Ms. Tucker did not then file a statement of additional material facts.  On October 26, 2022, Lantmännen filed its reply, noting that Ms. Tucker had offered no facts under District of Maine Local Rule 56(c).  *Def.'s Reply in Support of Its Mot. for Summ. J.* at 1 (ECF No. 61) (*Def.'s Reply*).

On May 3, 2023, after noticing that she had failed to file a statement of additional material facts, Ms. Tucker filed a motion for leave to file one.  *Pl.'s Mot. for Leave to File Pl.'s Statement of Material Facts* (ECF No. 63) (*Pl.'s Leave Mot.*).  On

May 12, 2023, Lantmännen filed an objection.  *Def.'s Resp. in Opp'n to Pl.'s Mot. for Leave to File Untimely Statement of Additional Facts* (ECF No. 64).  On May 24, 2023, Ms. Tucker filed a proposed Statement of Additional Material Facts.  *See Pl.'s Statement of Additional Material Facts* (ECF No. 67) (PSAMF).  The Court issued an order granting Ms. Tucker's motion for leave to file a statement of additional material facts on May 30, 2023.  *See Order on Pl.'s Mot. for Leave to File Untimely Statement of Additional Facts* (ECF No. 68).

In its May 30, 2023 order, the Court instructed the parties to consult with each other and agree, if possible, to a new briefing schedule.  *Id.* at 19.  On June 12, 2023, the parties submitted a joint status report.  *See Jt. Status Update Regarding Sanctions and Summ. J. Briefing Completion* (ECF No. 71).  In this status report, Ms. Tucker stipulated that she would not file an amended response to Lantmännen's motion for summary judgment, and the parties agreed to a new briefing schedule.  *Id.* at 1-2.

On June 30, 2023, the Court held a telephone conference with the parties, during which it requested that Ms. Tucker re-file her response to Lantmännen's motion for summary judgment.  *Min. Entry* (ECF No. 73).  On July 5, 2023, Ms. Tucker filed her amended response to Lantmännen's motion for summary judgment.[1] *See Pl.'s Amended Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 75) (*Pl.'s Amended Opp'n*).  On July 20, 2023, Lantmännen filed an amended reply, *see*

---

[1]     Ms. Tucker first filed her amended response to Lantmännen's motion for summary judgment on July 3, 2023.  *See Pl.'s Amended Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 74). Due to formatting errors, the Clerk marked this initial filing as having been filed in error, making ECF No. 75 the operative filing.

*Def.'s Reply in Support of Its Mot. for Summ. J.* (ECF No. 76) (*Def.'s Amended Reply*), and a response to Ms. Tucker's statement of additional material facts, *see Def.'s Resp. to Pl.'s Statement of Additional Material Facts* (ECF No. 77) (DRPSAMF).  Because Lantmännen's response to Ms. Tucker's statement of additional material facts contained requests to strike, Ms. Tucker filed a response to these requests to strike on July 28, 2023.  *See Pl.'s Opp'n to Def.'s Req. to Strike Certain of Pl.'s Statement of Material Facts* (ECF No. 78) (*Pl.s Opp'n to Def.'s Req. to Strike*).

On July 31, 2023, Lantmännen moved for oral argument.  *Def.'s Req. for Oral Arg. Concerning Its Mot. for Summ. J.* (ECF No. 79).  On August 5, 2023, the Court granted the motion for oral argument.  *Order* (ECF No. 81).  On September 26, 2023, the Court held oral argument.  *Min. Entry* (ECF No. 85).

## II.  RINDA TUCKER'S COMPLAINT

In her complaint for gender and age discrimination, Rinda Tucker sets forth four counts: 1) Count I: Gender Discrimination in Violation of the Maine Human Rights Act (MHRA); 2) Count II: Age Discrimination in Violation of the MHRA; 3) Count III: Negligent Misrepresentation; and 4) Count IV: Breach of Contract.[2] *Compl.* at 2-4.

## III.  STATEMENT OF FACTS

### A.  Rinda Tucker and Lantmännen

---

[2]     At oral argument on September 26, 2023, Attorney Loranger confirmed that Ms. Tucker is no longer pressing her breach of contract claim.  In light of Attorney Loranger's concession, the Court dismisses Count IV with prejudice and has not discussed its merits.

Rinda Tucker is a 62-year-old resident of Kittery, Maine.  DSMF ¶ 4; PRDSMF ¶ 4.  She attended Colby-Sawyer College, where she obtained an associates science degree, from 1979 through 1982.  PSAMF ¶ 1; DRPSAMF ¶ 1.  In 1984, Ms. Tucker attended Framingham State, where she received a bachelor's degree in food science and became a nutritionist.  PSAMF ¶ 1; DRPSAMF ¶ 1.  Ms. Tucker has over twenty-eight years of experience in the food industry, and she claims a proven history of success selling/marketing in the industry.[3]  PSAMF ¶ 2; DRPSAMF ¶ 2.

Lantmännen Unibake USA, Inc. operates a bakery and food distribution business of frozen and fresh-baked breads and pastries.  DSMF ¶ 5; PRDSMF ¶ 5.  Lantmännen represents itself as:

> A leading bakery with expertise in frozen and fresh baked goods. Its facility in St. Petersburgh, Florida, a Grade AA-accredited bakery, produces almost 40 million pounds a year of gourmet rolls, sandwich carriers, baguettes artisan loaves using high quality ingredients and no preservatives. The company employs salespeople across the United States to sell and distribute the Company's baked goods to its customers.

PSAMF ¶ 5; DRPSAMF ¶ 5.  Lantmännen employs a Progressive Discipline Policy (PDP).  PSAMF ¶ 6; DRPSAMF ¶ 6.  This policy outlines various disciplinary steps, which include coaching, verbal warnings, written warnings, suspensions, and final warnings.  PSAMF ¶ 7; DRPSAMF ¶ 7. The PDP provides that Lantmännen may

---

[3]     PSAMF ¶ 2 states: "Tucker has over 28 years in the food industry with a proven history for success selling/marketing in the food industry."  PSAMF ¶ 2.  In support of this statement of fact, Ms. Tucker cites her own resume.  *Id.* (citing *Stipulated R.*, Attach. 8, *Resume of Rinda Tucker*).

Lantmännen admits that Ms. Tucker's resume contains this statement.  DRPSAMF ¶ 2 (citing *Stipulated R.*, Attach. 8, *Resume of Rinda Tucker*).  However, it denies Ms. Tucker's characterization that she has a 28-year "proven history for success."  *Id.*

Rather than engage in the parties' dispute about whether Ms. Tucker's twenty-eight years in the food industry can properly be characterized as successful, the Court amended PSAMF ¶ 2 to reflect that this characterization is Ms. Tucker's opinion.

5

issue written warnings for the "[i]nadequate performance of assigned duties."[4] PSAMF ¶ 8; DRPSAMF ¶ 8.

From 2017 through 2019, Lantmännen employed approximately 15 salespeople called "sales managers" across the United States to sell and distribute baked goods to its customers.[5]  DSMF ¶ 6; PRDSMF ¶ 6.  In early 2017, Ms. Tucker worked for Smithfield Foods as an Area Sales Manager.  PSAMF ¶ 9; DRPSAMF ¶ 9. Ms. Tucker enjoyed her employment with Smithfield, received a yearly bonus, and had no intention of leaving her employment with Smithfield.[6]  PSAMF ¶ 10; DRPSAMF ¶ 10.

---

[4]     PSAMF ¶ 8 states: "The PDP provides for the issuance of "Written Warnings" for "Inadequate performance of assigned duties."

        Lantmännen interposes a qualified response to PSAMF ¶ 8, asserting that its PDP states that written warnings "*may* be issued" for the inadequate performance of assigned duties "with or without prior verbal warnings, and *may* result in more severe discipline, including dismissal, depending on the circumstances and the employee's overall work record." DRPSAMF ¶ 8 (emphases in original) (quoting *Stipulated R.*, Attach. 10, *Lantmännen Unibake USA, Inc. Employee Handbook*).  Lantmännen further contends that under its PDP employees "*may* be discharged without prior warning for certain offenses," including "[u]nsatisfactory job performance."  *Id.* (emphasis in original) (quoting *Stipulated R.*, Attach. 10, *Lantmännen Unibake USA, Inc. Employee Handbook*).  Based on the Court's review of the relevant pages of the Lantmännen Employee Handbook, the Court modified PSAMF ¶ 8 to match the language in the handbook.

[5]     DSMF ¶ 6 states that Lantmännen employs "approximately 12" salespeople across the United States.  DSMF ¶ 6.  Ms. Tucker denies the statement, asserting that Lantmännen employs about 15 salespeople.  PRDSMF ¶ 6.  Ms. Tucker bases her denial on a Lantmännen document that lists 15 salespeople for the period 2017-2019.  *Id.* (citing *Pl.'s R.*, Attach. 1, *Aff. of Guy D. Loranger* ¶ 4; *id.*, Attach. 4, *Lantmännen Sales by Salesperson 2017-2019* (*Lantmännen Sales by Salesperson*)).  As the Court is required to view disputed matters in the light most favorable to Ms. Tucker as nonmovant, the Court accepts her version.

[6]     The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 10 in its separate order on Lantmännen's requests to strike.  *See Order on Lantmännen Unibake USA, Inc.'s Reqs. to Strike and Other Objs.* at 11 (ECF No. 86) (*Order on Reqs. to Strike*).

        Lantmännen also interposes a qualified response to PSAMF ¶ 10, claiming it "can neither admit nor deny Plaintiff's subjective feelings dating back to 2017 about her prior employment, her bonuses at this prior employer, nor her subjective intentions in 2017 about leaving her prior employer." DRPSAMF ¶ 10.  The Court rejects this qualification as Lantmännen failed to include any supporting record or factual citations.  Further, Ms. Tucker's assertion that she received a yearly bonus while at Smithfield Foods is supported by her deposition testimony.  *See Stipulated R.*, Attach. 1, *Dep. of Rinda Tucker – Oct. 8, 2021* at 56:13-14 (*Oct. Tucker Dep.*).

Lantmännen hired Ms. Tucker in March 2017 as its Northeastern Regional Sales Manager.  DSMF ¶ 7; PRDSMF ¶ 7.  Lantmännen's Northeast Zone Manager at the time, Mike Minden, recruited Ms. Tucker to work for Lantmännen.  DSMF ¶ 8; PRDSMF ¶ 8.  In early 2017, Mr. Minden used a recruiter, the Scoville Group, to recruit Ms. Tucker to Lantmännen.  PSAMF ¶ 11; DRPSAMF ¶ 11.  Mr. Minden knew Ms. Tucker through the food industry.  PSAMF ¶ 12; DRPSAMF ¶ 12.  Ms. Tucker initially spoke to Mr. Minden for about an hour about the sales position.  PSAMF ¶ 13; DRPSAMF ¶ 13.  In return for her hire, Mr. Minden required Ms. Tucker to remain employed with Lantmännen for a minimum of five years.[7]  PSAMF ¶ 14; DRPSAMF ¶ 14.  Ms. Tucker understood Mr. Minden's requirement of employment for five years to be mean that she was assured of employment with Lantmännen for five years.[8]  PSAMF ¶ 15; DRPSAMF ¶ 15.

### B.    The Lantmännen Offer

Lantmännen memorialized what it contends was its employment offer to Ms. Tucker in a written letter dated March 20, 2017.[9]  DSMF ¶ 9; PRDSMF ¶ 9.  The offer

---

[7]    The Court addressed and rejected Lantmännen's multiple objections to PSAMF ¶ 14 in its contemporaneous order.  *See Order on Reqs. to Strike* at 11-14.

[8]    The Court addressed and rejected Lantmännen's request to strike PSAMF ¶ 15 in its contemporaneous order.  *See Order on Reqs. to Strike* at 14-16.  Additionally, Lantmännen denies PSAMF ¶ 15 on the ground that Ms. Tucker testified in her deposition "that her employment offer letter accurately described the terms of her employment at Lantmännen," and the letter "does not guarantee or promise any set length of employment."  DRPSAMF ¶ 15.  The Court rejects Lantmännen's denial as being outside the scope of the fact asserted insofar as it references Ms. Tucker's offer letter.  To the extent that Ms. Tucker's deposition testimony concerning the accuracy of her offer letter casts doubt on PSAMF ¶ 15, this merely raises questions of credibility and evidentiary weight, best left for a jury.  The Court includes PSAMF ¶ 15.

[9]    DSMF ¶ 9 asserts: "Lantmännen memorialized its employment offer to Plaintiff in a written letter dated March 20, 2017."  DSMF ¶ 9.  Ms. Tucker denies this paragraph on the ground that the letter did not reference Mr. Minden's guarantee of five years of employment to her.  PRDSMF ¶ 9.  The Court has slightly modified DSMF ¶ 9 to reflect that Lantmännen contends the letter contained its employment offer to Ms. Tucker.

letter does not identify a set period for Ms. Tucker's employment, nor does it provide any guaranteed length of employment to her.  DSMF ¶ 10; PRDSMF ¶ 10; DSMF ¶ 17; PRDSMF ¶ 17.  The offer letter also provided for a 90-day probationary period. DSMF ¶ 11; PRDSMF ¶ 11.  After receiving the offer letter, Ms. Tucker handwrote modifications to certain terms, including her start date and amount of Paid Time Off. DSMF ¶ 12; PRDSMF ¶ 12.  Ms. Tucker testified that to the extent she did not agree with the terms in the offer letter, she handwrote in more accurate terms.  DSMF ¶ 13; PRDSMF ¶ 13.  Ms. Tucker did not write anything about an allegedly promised five-year contract nor did she contact anyone at Lantmännen to suggest the offer of at-will employment was incorrect before signing the letter.  DSMF ¶ 14; PRDSMF ¶ 14.  The omission of the length of employment did not concern Ms. Tucker because she trusted Mr. Minden to keep their agreement regarding the length of employment.[10]  PSAMF ¶ 16; DRPSAMF ¶ 16.  Ms. Tucker signed the offer letter to accept the terms and conditions of her employment as outlined in the letter and added a handwritten note of "Thank you!!" above her signature.[11]  DSMF ¶ 15; PRDSMF ¶ 15.

---

[10]    The Court addressed and rejected Lantmännen's request to strike PSAMF ¶ 16 in its contemporaneous order.  *See Order on Reqs. to Strike* at 16-17.  Lantmännen also denies PSAMF ¶ 16 on the ground that Ms. Tucker's  deposition testimony that "the offer letter set forth the terms of her employment with Lantmännen" contradicts her affidavit.  DRPSAMF ¶ 16.  Ms. Tucker argues that her deposition testimony in fact supports her affidavit.  *Pl.'s Opp'n to Def.'s Req. to Strike* at 3-4.  The Court rejects Lantmännen's denial as being outside the scope of the fact asserted.

[11]    Ms. Tucker denies DSMF ¶ 15 on the ground that her signature did not indicate her acceptance that the terms of employment would be limited to the terms in the letter.  PRDSMF ¶ 15.  The Court does not accept Ms. Tucker's denial because the letter and her acceptance speak for themselves and because her denial is beyond the scope of DSMF ¶ 15.

Ms. Tucker testified that the offer letter accurately described the terms of her employment at Lantmännen.[12]   DSMF ¶ 16; PRDSMF ¶ 16.   By Ms. Tucker's own admission, she never received anything in writing promising five years of guaranteed employment at Lantmännen.  DSMF ¶ 18; PRDSMF ¶ 18.  Ms. Tucker's sole basis for believing Lantmännen guaranteed her a five-year employment contract was a single statement by her former supervisor, Mike Minden, during her initial job interview in which he stated, "give me five years at Lantmännen.  Can you do that?"  DSMF ¶ 19; PRDSMF ¶ 19.

Mr. Minden, who is no longer employed by Lantmännen, provided a sworn declaration stating that he never promised Ms. Tucker a guaranteed length of employment nor was he aware of her having any employment contract.  DSMF ¶ 20; PRDSMF ¶ 20.  Ms. Tucker testified that Lantmännen's President, Scott Kolinski, never conveyed that she had a guaranteed length of employment.  DSMF ¶ 21; PRDSMF ¶ 21.  Ms. Tucker also testified that Lantmännen's Director of Sales, Ralph Hoffmann, never conveyed that she had a guaranteed length of employment.  DSMF ¶ 22; PRDSMF ¶ 22.  Additionally, two former salespeople employed in the same position as Ms. Tucker, Heather Bryant and Val Embrey, testified that they were

---

[12]   Ms. Tucker admits that the offer letter accurately described some but not all of the terms of employment.  PRDSMF ¶ 16.  During her deposition, the follow exchange took place:

> Q. Do you agree, as you sit here today, that this offer letter accurately described the terms of your employment at Lantmännen?
> A. Yes, I agreed to it.

*Oct. Tucker Dep.* at 72:3-7.  As Lantmännen's paragraph tracks the question and Ms. Tucker's response, the Court rejects Ms. Tucker's denial.

never promised employment contracts nor were they aware of any Lantmännen salespeople having employment contracts.  DSMF ¶ 23; PRDSMF ¶ 23.

### C.    The Lantmännen Employee Handbook

Upon accepting Lantmännen's job offer and before she started with the company, Ms. Tucker received Lantmännen's Employee Handbook.  DSMF ¶ 24; PRDSMF ¶ 24.  The Employee Handbook states in the Introduction:

> Employment with Lantmännen is "at will."   This means that all employees at Lantmännen are employed for no definite duration and employment may be terminated, with or without cause, at any time at the will of either the employee or Lantmännen.

DSMF ¶ 25; PRDSMF ¶ 25.  The Employee Handbook also provides:

> Completion of a probationary period does not guarantee continued employment with Lantmännen for any specific length of time. Employment with Lantmännen is at will and for an indefinite period and may be terminated, with or without cause, at the will of either the employee or Lantmännen.

DSMF ¶ 26; PRDSMF ¶ 26.  The Employee Handbook explains under "Standards of Conduct" that "[n]either these rules nor other policies are a contract or other promise of employment and in no way alter the fact that employment is terminable at will." DSMF ¶ 27; PRDSMF ¶ 27.  The Employee Handbook details that a reason for "immediate discharge" includes "unsatisfactory job performance."   DSMF ¶ 28; PRDSMF ¶ 28.  The Employee Handbook also states in the "Ending Employment" section that "[b]ecause employment at Lantmännen is based on mutual consent, either the employee or Lantmännen can terminate employment at any time, with or without cause."  DSMF ¶ 29; PRDSMF ¶ 29.

Ms. Tucker signed a form acknowledging receipt of the Employee Handbook on March 29, 2017.  DSMF ¶ 30; PRDSMF ¶ 30.  The Employee Handbook acknowledgement form that Ms. Tucker signed states:

> I further understand and acknowledge that my employment with Lantmännen is 'at will.'  This means that I am employed for no definite duration and that my employment may be terminated, with or without cause, at any time either by me or by Lantmännen.

DSMF ¶ 31; PRDSMF ¶ 31.  The acknowledgement form also states: "[i]n addition, I understand and acknowledge that neither this Handbook nor any provisions in this Handbook constitute a contract of employment or any other type of contract."  DSMF ¶ 32; PRDSMF ¶ 32.  Ms. Tucker testified that she received a copy of the Handbook annually.  DSMF ¶ 33; PRDSMF ¶ 33.  At no point during her tenure with Lantmännen did Ms. Tucker ever object to the terms of the Handbook nor did she claim she had a five-year employment guarantee.  DSMF ¶ 34; PRDSMF ¶ 34.

### D.    Rinda Tucker's Employment at Lantmännen

Ms. Tucker began work for Lantmännen on April 1, 2017.  DSMF ¶ 35; PRDSMF ¶ 35; PSAMF ¶ 17; DRPSAMF ¶ 17. In her role, Ms. Tucker sold Lantmännen's products and built customer relationships in the company's Northeast zone.  DSMF ¶ 36; PRDSMF ¶ 36.  Each year, Lantmännen established sales targets for each of its sales employees.  DSMF ¶ 37; PRDSMF ¶ 37.  Each individual salesperson's goals were different and based on their specific region because each region is unique.  DSMF ¶ 38; PRDSMF ¶ 38.

Shortly after Ms. Tucker began her employment, Mr. Minden showed her the sales goal for the calendar year 2017 and the current sales, which were well below

11

the sales goal for the year.[13]  PSAMF ¶ 18; DRPSAMF ¶ 18.  Mr. Minden told Ms.

Tucker not to worry about the sales goal for the year as the goal did not apply to her

given that she only started in April as opposed to the beginning of 2017.[14]  PSAMF ¶

19; DRPSAMF ¶ 19.  Mr. Minden told Ms. Tucker to focus on increasing sales, which

she did.  PSAMF ¶ 19; DRPSAMF ¶ 19.  Ms. Tucker increased sales by calling on

accounts her predecessor had ignored, calling in chain accounts, healthcare accounts,

and her contacts from Smithfield.[15]  PSAMF ¶ 20; DRPSAMF ¶ 20.  In the October

2017 "Monthly Executive Team Meeting," Mr. Hoffmann praised Ms. Tucker,

documenting: "Rinda Tucker – Has stopped bleeding in the market . . . Rinda has

brought opportunity, but we are not competitive on pricing."[16]   PSAMF ¶ 22;

DRPSAMF ¶ 22.  By the end of the year, sales had increased significantly and were

headed in the right direction.[17]  PSAMF ¶ 17; DRPSAMF ¶ 17.  Mr. Minden and other

---

[13]    The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 18 in its contemporaneous order.  *See Order on Reqs. to Strike* at 17-19.  The Court also addressed and rejected Lantmännen's qualification in that order.  *See id.*

[14]    The Court addressed and rejected Lantmännen's request to strike PSAMF ¶ 19 in its contemporaneous order.  *See Order on Reqs. to Strike* at 17-19.  Lantmännen also denies PSAMF ¶ 19, incorporating the reasoning behind its denial of PSAMF ¶ 18.  DRPSAMF ¶ 19.  The Court concludes that Ms. Tucker's affidavit supports PSAMF ¶ 19 and rejects Lantmännen's denial.

[15]    Lantmännen interposes a qualified response to PSAMF ¶ 20.  It "admits that Plaintiff increased her gross sales between 2017 and 2018," but contends that it lacks "sufficient knowledge to either admit or deny the specific methods by which she did so" on the ground that Ms. Tucker "provides no factual support" for this claim.  DRPSAMF ¶ 20.  Ms. Tucker cites her affidavit as factual support for PSAMF ¶ 20.  PSAMF ¶ 20.  The Court reviewed Ms. Tucker's affidavit and concludes that it supports PSAMF ¶ 20.  Accordingly, the Court rejects Lantmännen's qualification.

[16]    PSAMF ¶ 22 does not specify any support for this statement.  PSAMF ¶ 22. Based on its review of the record, the Court modified PSAMF ¶ 22 to reflect that the statement was made by Mr. Hoffmann.  *See Stipulated R.*, Attach. 43, *Dep. of Ralph A. Hoffmann* at Ex. 1 (*Hoffmann Dep.*).

Lantmännen also interposes a qualified response to PSAMF ¶ 22, adding that Mr. Hoffmann made his comments before Ms. Tucker's performance worsened in 2018 and 2019.  DRPSAMF ¶ 22. The Court rejects this qualification as beyond the scope of the asserted fact.

[17]    Lantmännen admits that Ms. Tucker "stopped bleeding" in her market, but it asserts there is no evidence that sales "increased significantly in 2017."  DRPSAMF ¶ 21 (*Hoffmann Dep.* at Ex. 1). It continues, "Plaintiff's sales target was $5,915,000 and Plaintiff's actual sales were $5,401,718 — a

members of upper management congratulated Ms. Tucker for "stopping the bleeding" in the Northeast Zone and landing several new accounts.  PSAMF ¶ 21; DRPSAMF ¶ 21.  Ms. Tucker's 2017 annual evaluation graded out to an average of 3.4, which fell between a scale of "good" and "very good."  PSAMF ¶ 23; DRPSAMF ¶ 23.

In 2017, Lantmännen salesperson Eric Ingraham fell $880,171.00 short of his sales goal.  PSAMF ¶ 24; DRPSAMF ¶ 24.  Lantmännen did not discipline Mr. Ingraham for falling short of his 2017 sales goal.[18]  PSAMF ¶ 25; DRPSAMF ¶ 25.  In 2017, salesperson Anthony Mangano fell $1,742,563.00 short of his sales goal.  PSAMF ¶ 26; DRPSAMF ¶ 26.  Lantmännen did not immediately discipline Mr. Mangano for falling short of his 2017 sales goal; however, Lantmännen terminated

---

shortfall of $513,282."  *Id.*  Lantmännen's response is beyond the scope of PSAMF ¶ 21, and the Court admits PSAMF ¶ 21.

[18]    Lantmännen interposes a qualified response to PSAMF ¶ 25.  DRPSAMF ¶ 25.  Lantmännen first concedes that it "did not discipline Mr. Ingraham . . . for a single below expectation sales year."  *Id.*  It then argues that PSAMF ¶ 25 omits that Mr. Ingraham "missed his sales target by a lower percentage than Plaintiff missed and then exceeded his sales target in 2018, whereas Plaintiff again missed her sales target."  *Id.* (citing *Def.'s R.,* Attach. 8, *Master Sales Performance Chart*) (emphasis omitted).  Lantmännen further claims that in both 2017 and 2018, Mr. Ingraham's sales volume was more than double that of Ms. Tucker and that Mr. Ingraham had the highest gross sales volume of any Lantmännen salesperson in 2018.  *Id.* (citing *Def.'s R.*, Attach. 8, *Master Sales Performance Chart*) (emphasis omitted).  According to Lantmännen, "[t]he disparity between the sales volume, goals, and results between [Mr. Ingraham] on the Pacific Coast and [Ms. Tucker] in New England is a prime example as to why comparing sales performances across different regions is both unfair and not feasible."  *Id.* (citing *Stipulated R.*, Attach. 24, *Dep. of Rinda Tucker - Dec. 16, 2021* at 53:16-25 (*Dec. Tucker Dep.*)).

The Court rejects Lantmännen's qualifications concerning Mr. Ingraham's performance in 2018 and the propriety of comparing Mr. Ingraham's performance with that of Ms. Tucker.  Even if a comparison is not entirely congruent, the Court accepts evidence that other salespeople did not perform well and were not sanctioned while Ms. Tucker was sanctioned for a similar performance as potentially probative of discriminatory and disparate treatment.  As it is not a factfinder, the Court is unable to resolve Ms. Tucker and Lantmännen's contrasting inferences, but their disagreement on what are supposed to be undisputed facts highlights the dispute, leaving only whether the factual disputes are material.  For these reasons, the Court also rejects Lantmännen's other qualifications based on the contention that it is improper to compare Ms. Tucker's performance to that of other salespeople.

Mr. Mangano in 2019 for poor sales.[19]   PSAMF ¶ 27; DRPSAMF ¶ 27.   In 2017, salesperson Drew Wilson fell $1,091,422.00 short of his sales goal.   PSAMF ¶ 28; DRPSAMF ¶ 28.   Lantmännen did not discipline Mr. Wilson for falling short of his 2017 sales goal.[20]   PSAMF ¶ 29; DRPSAMF ¶ 29.   In 2017, salesperson John Stoops fell $642,349.00 short of his sales goal.   PSAMF ¶ 30; DRPSAMF ¶ 30.   Lantmännen did not discipline Mr. Stoops for falling short of his 2017 sales goal.[21]   PSAMF ¶ 31; DRPSAMF ¶ 31.   In 2017, salesperson Timothy Decker fell $1,224,592.00 short of his

---

[19]   PSAMF ¶ 27 reads: "Defendant did not discipline Mangano for falling short of his 2017 sales goal."   PSAMF ¶ 27.   Lantmännen denies PSAMF ¶ 27, saying, "On October 31, 2019, Lantmännen fired Mr. Mangano ("A.M.") for poor sales performance because of his consecutive years of poor sales from 2017-2019."   DRPSAMF ¶ 27.   The record shows that Mr. Mangano was terminated in 2019 for "[p]oor sales performance."   *See Pl.'s R.*, Attach. 1, *Aff. of Guy D. Loranger* at Ex. 4.   The record does not specify a timeframe for Mr. Mangano's poor performance.   *Id.*   At the same time, the parties do not dispute that Mr. Mangano failed to meet his sales goals in 2018 as well.   *See* PSAMF ¶ 43; PRDSAMF ¶ 43.   Mindful of its obligation to view disputed matters in the light most favorable to Ms. Tucker, the Court rejects Lantmännen's denial and modifies PSAMF ¶ 27 to reflect the record.

[20]   Lantmännen interposes a qualified response to PSAMF ¶ 29.   DRPSAMF ¶ 29.   Lantmännen concedes that it "did not discipline Mr. Wilson . . . for a single poor sales year" but argues that PSAMF ¶ 29 omits that Mr. Wilson "exceeded his sales target in 2018 whereas Plaintiff again missed her sales target."   *Id.* (citing *Def.'s R.*, Attach. 8, *Master Sales Performance Chart*).   Lantmännen further claims that in both 2017 and 2018, Mr. Wilson's gross sales exceeded Ms. Tucker's by more than $1,000,000.   *Id.* (citing *Def.'s R.*, Attach. 8, *Master Sales Performance Chart*) (emphasis omitted)).   The Court rejects Lantmännen's qualifications as beyond the scope of the fact asserted.

[21]   Lantmännen denies PSAMF ¶ 31, stating, "On December 31, 2019, Lantmännen fired Mr. Stoops ("J.S.") for poor sales performance because of his consecutive years of poor sales from 2017-2019."   DRPSAMF ¶ 31 (citing *Hoffmann Dep.* at 33:22-34:9; *Def.'s R.*, Attach. 9, *Employee Termination Census*; and *Def.'s Suppl. R.*, Attach. 1, *Dep. of Gregory V. Lutes* at 41:16-17 (*Lutes Dep.*)).   The record shows that Mr. Stoops was terminated in 2019 for "[p]oor sales performance."   *See Pl.'s R.*, Attach. 1, *Aff. of Guy D. Loranger* at Ex. 4.   The Court also notes the following exchange from the record:

> Q. Okay. Was there a specific reason for Stoops' termination?
> A. A specific reason, no.  It was a collection of sales data and performance issues.
> Q. What were the performance issues aside from sales?
> A. I don't recall all of them, but again related to the metrics that I pointed out earlier, CRM Management, sales numbers.

*Lutes Dep.* at 42:5-12.   Elsewhere, Mr. Lutes explained that CRM is Central Reporting Management, a system that "helps us track activities with operators and distributors."   *Lutes Dep.* at 10:2-5.   Based on Mr. Lutes' testimony, it appears Lantmännen terminated Mr. Stoops both for poor sales performance and for his "CRM Management."   The Court therefore rejects Lantmännen's denial, as this exchange casts doubt upon it and the Court is required to view disputed matters in the light most favorable to Ms. Tucker.

sales goal.  PSAMF ¶ 32; DRPSAMF ¶ 32.  Lantmännen did not discipline Mr. Decker for falling short of his 2017 sales goal.[22]  PSAMF ¶ 33; DRPSAMF ¶ 33.  In 2017, salesperson Brian Davel fell $527,923.00 short of his sales goal.  PSAMF ¶ 34; DRPSAMF ¶ 34.  Lantmännen did not discipline Mr. Davel for falling short of his 2017 sales goal.[23]  PSAMF ¶ 35; DRPSAMF ¶ 35.  In 2017, salesperson Frank Swindle fell $576,706.00 short of his sales goal.  PSAMF ¶36; DRPSAMF ¶ 36.  Lantmännen did not discipline Mr. Swindle, a Zone Manager, for falling short of his 2017 sales goal.[24]  PSAMF ¶ 37; DRPSAMF ¶ 37.  In 2017, salesman Greg Lutes fell $896,335.00 short of his sales goal.[25]  PSAMF ¶ 38; DRPSAMF ¶ 38.  Lantmännen did not

---

[22]      Lantmännen interposes a qualified response to PSAMF ¶ 33.  DRPSAMF ¶ 33.  Lantmännen first concedes that it "did not discipline Mr. Decker ("T.D") for a single below expectation sales year."  *Id.*  It then argues that PSAMF ¶ 33 omits that Mr. Decker's "gross sales were more than $1 million over Plaintiff's sales for each year between 2017 and 2019."  *Id.* (citing *Def.'s R.*, Attach. 8, *Master Sales Performance Chart*).  Lantmännen also notes that Mr. Decker was laid off by the company due to impact of the COVID-19 pandemic on its business.  *Id.* (citing *Hoffmann Dep.* at 7:22, 38:10-13).  The Court rejects Lantmännen's qualifications as beyond the scope of the fact asserted.

[23]      Lantmännen interposes a qualified response to PSAMF ¶ 35, conceding that it "did not discipline Mr. Davel ("B.D.") for a single poor sales year" but reiterating its arguments that "direct comparisons of performance are impossible."  DRPSAMF ¶ 35.  For the reasons explained in fn. 18 above, the Court rejects Lantmännen's qualification and will accept evidence that other salespersons were not disciplined for poor performance.

[24]      Lantmännen interposes a qualified response to PSAMF ¶ 37.  DRPSAMF ¶ 37.  Lantmännen first concedes that it "did not discipline Mr. Swindle ("F.S.") for a single poor sales year."  *Id.*  It goes on to compare Mr. Swindle's performance in 2019 with that of Ms. Tucker, noting that Mr. Swindle surpassed his sales goal by 16% whereas Ms. Tucker fell short of hers by 10.8%.  *Id.* (citing *Def.'s R.*, Attach. 8, *Master Sales Performance Chart*).  The Court rejects Lantmännen's qualification as beyond the scope of the fact asserted.

Lantmännen further asserts that Mr. Swindle's performance cannot be compared with Ms. Tucker's because Mr. Swindle was a Zone Manager, whereas Ms. Tucker was a Sales Manager.  DRPSAMF ¶ 37 (citing *Stipulated R.*, Attach. 33, *Dep. of Scott F. Kolinski* at 40:4-11 (*Kolinski Dep.*)).  The Court modified PSAMF ¶ 37 to indicate that Mr. Swindle was a Zone Manager; however, the extent of the differences between a Zone Manager and a Sales Manager must be resolved by a jury.

[25]      The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 38 in its contemporaneous order.  *See Order on Reqs. to Strike* at 19-20.

discipline Mr. Lutes for falling short of his 2017 sales goal.[26]  PSAMF ¶ 39; DRPSAMF ¶ 39.

In 2018, Ms. Tucker continued to land new accounts and increased sales by over $350,000.[27]  PSAMF ¶ 40; DRPSAMF ¶ 40.  In 2018, Ms. Tucker landed a major account with Ocean Properties, which Lantmännen had lost five years earlier.  PSAMF ¶ 41; DRPSAMF ¶ 41.  In appreciation for landing the account, Scott Kolinski, Lantmännen's president, gave Ms. Tucker a bonus.  PSAMF ¶ 41; DRPSAMF ¶ 41.  Ms. Tucker's 2018 annual evaluation stated:

> **Rinda did achieve her 2018 sales goal.**  She is dedicated and self-driven and wants to succeed.  She is very protective of our customers and tries to please them.  She is professional and will drive new sales and her extended broker community works well with everyone, takes responsibility, and wants everyone to do well.  Works independently and is success driven. [28]

PSAMF ¶ 42; DRPSAMF ¶ 42.

In 2018, salesperson Anthony Mangano fell $3,046,309.00 short of his sales goal.  PSAMF ¶ 43; DRPSAMF ¶ 43.  Lantmännen did not immediately discipline Mr. Mangano for falling short of his 2018 sales goal; however, in 2019 Lantmännen fired Mr. Mangano for poor sales.[29]  PSAMF ¶ 44; DRPSAMF ¶ 44.  In 2018, salesperson

---

[26]     The Court addressed and rejected Lantmännen's request to strike PSAMF ¶ 39 in its contemporaneous order.  *See Order on Reqs. to Strike* at 19-20.

[27]     Lantmännen interposes a qualified response to PSAMF ¶ 40.  It admits that "Plaintiff's 2018 sales were higher than her 2017 sales," but it nevertheless contends that Ms. Tucker "missed her sales goals" by $163,327.  DRPSAMF ¶ 40 (citing *Def.'s R.*, Attach. 8, *Master Sales Performance Chart*).  The Court rejects Lantmännen's qualification as beyond the scope of PSAMF ¶ 40.

[28]     Lantmännen admits that PSAMF ¶ 42 accurately quotes Ms. Tucker's annual evaluation but interposes a qualified response claiming that Ms. Tucker missed her 2018 sales target by $163,327.  DRPSAMF ¶ 42.  The Court rejects Lantmännen's qualification as outside the scope of the fact asserted, as PSAMF ¶ 42 addresses what was written in Ms. Tucker's evaluation.

[29]     Lantmännen denies PSAMF ¶ 44, saying, "On October 31, 2019, Lantmännen fired Mr. Mangano ("A.M.") for poor sales performance because of his consecutive years of poor sales from 2017-2019."  DRPSAMF ¶ 44 (citing *Hoffmann Dep.* at 29:11-18).  The record shows that Mr. Mangano was

John Stoops fell $888,456.00 short of his sales goal.  PSAMF ¶ 45; DRPSAMF ¶ 45. Lantmännen did not discipline Mr. Stoops for falling short of his 2018 sales goal.[30] PSAMF ¶ 46; DRPSAMF ¶ 46.  In 2018, salesperson Timothy Decker fell $551,855.00 short of his sales goal.[31]  PSAMF ¶ 47; DRPSAMF ¶ 47.  Lantmännen did not discipline Mr. Decker for falling short of his 2018 sales goal.[32]  PSAMF ¶ 48; DRPSAMF ¶ 48.  In 2018, salesperson Brian Davel fell $517,707.00 short of his sales goal.  PSAMF ¶ 49; DRPSAMF ¶ 49. Lantmännen did not discipline Mr. Davel for falling short of his 2018 sales goal.[33]  PSAMF ¶ 50; DRPSAMF ¶ 50.  In 2018, salesperson Frank Swindle fell $1,699,701.00 short of his sales goal.  PSAMF ¶ 51; DRPSAMF ¶ 51.  Lantmännen did not discipline Mr. Swindle, a Zone Manager, for

terminated in 2019 for "[p]oor sales performance."  *See Pl.'s R.* Attach. 1, *Affidavit of Guy D. Loranger* at Ex. 4.  The record does not specify a timeframe for Mr. Mangano's poor performance.  *Id.*  The parties do not dispute that Mr. Mangano failed to meet his sales goals in 2017 as well.  *See* PSAMF ¶ 26; DRPSAMF ¶ 26.  Mindful of its obligation to view disputed matters in the light most favorable to Ms. Tucker, the Court rejects Lantmännen's denial and modifies PSAMF ¶ 44 to reflect the record.

[30]    Lantmännen denies PSAMF ¶ 46 for the same reasons set forth in fn. 21 above.  The Court resolves the denial in the same way for the same reasons as explained in fn. 21.

[31]    PSAMF ¶ 47 states that Mr. Decker fell short of his 2018 sales goal by $555,855.00.  PSAMF ¶ 47.  Lantmännen interposes a qualified response to PSAMF ¶ 47, stating its belief that Ms. Tucker's "Statement contains a typographical error" and that Mr. Decker only missed his sales goal by $551,855.00.  DRPSAMF ¶ 47.  After reviewing the record, the Court has confirmed that Mr. Decker only missed his 2018 sales goal by $551,855.00.  *See Lantmännen Sales by Salesperson.*  The Court revised PSAMF ¶ 47 accordingly.

[32]    Lantmännen interposes a qualified response to PSAMF ¶ 48.  DRPSAMF ¶ 48.  Lantmännen first concedes that it "did not discipline Mr. Decker ("T.D.") for a single poor sales year."  *Id.*  It then contends that Mr. Decker's "gross sales were more than $1 million over Plaintiff's sales for each year between 2017 and 2019," and that Mr. Decker "missed his [2019] sales goal by 0.6% whereas Plaintiff missed hers by 10.8%."  *Id.* (citing *Def.'s R.*, Attach. 8, *Master Sales Performance Chart*).  Lantmännen further notes that Mr. Decker was laid off due to impact of the COVID-19 pandemic on the company's business.  *Id.* (citing *Hoffmann Dep.* at 7:22, 38:10-13).  The Court rejects Lantmännen's qualifications as beyond the scope of the fact asserted.

[33]    Lantmännen interposes a qualified response to PSAMF ¶ 50, conceding that it "did not discipline Mr. Davel ("B.D.") for a single poor sales year" but reiterating its arguments about the propriety of comparing performance across sales territories.  DRPSAMF ¶ 50.  These contentions only address what may be inferred from PSAMF ¶ 50.  The summary judgment record consists of factual assertions, not inferences.  Therefore, the Court rejects Lantmännen's feasibility arguments.

falling short of his 2018 sales goal.[34]   PSAMF ¶ 52; DRPSAMF ¶ 52.   In 2018, salesperson Greg Lutes fell $1,007,432.00 short of his sales goal.[35]   PSAMF ¶ 53; DRPSAMF ¶ 53.   Lantmännen did not discipline Mr. Lutes for falling short of his 2018 sales goal.[36]   PSAMF ¶ 54; DRPSAMF ¶ 54.

In 2019, Ms. Tucker's sales target was $6,501,310 and her actual sales were $5,801,916—a shortfall of $699,394—and Ms. Tucker confirmed the accuracy of these figures.   DSMF ¶ 43; PRDSMF ¶ 43.   During Ms. Tucker's second year with Lantmännen, Mr. Minden left the company, and following his departure, Ms. Tucker did not do anything to try to memorialize her belief that Mr. Minden promised her a five-year employment contract.   DSMF ¶¶ 44-45; PRDSMF ¶¶ 44-45.

Mr. Minden was Ms. Tucker's supervisor for two of her three years of employment at Lantmännen, and he testified that he "had a positive working relationship with Ms. Tucker, and she performed well in her role."   PSAMF ¶ 3; DRPSAMF ¶ 3. Mr. Minden further testified, "I thought so highly of Ms. Tucker that,

---

[34]   Lantmännen interposes a qualified response to PSAMF ¶ 52. DRPSAMF ¶ 52. Lantmännen first concedes that it "did not discipline Mr. Swindle ("F.S.") for a single poor sales year." *Id.* It goes on to note that Mr. Swindle surpassed his 2019 sales goal by 16%. *Id.* (citing *Def.'s R.,* Attach. 8, *Master Sales Performance Chart*). The Court rejects this qualification as beyond the scope of the fact asserted.
  Lantmännen further argues that Mr. Swindle's performance cannot be compared with Ms. Tucker's because Mr. Swindle was a Zone Manager, whereas Ms. Tucker was a Sales Manager. DRPSAMF ¶ 52 (citing *Kolinski Dep.* at 40:4-11). The Court modified PSAMF ¶ 52 to indicate that Mr. Swindle was a Zone Manager; however, the extent of the differences at Lantmännen between a Zone Manager and a Sales Manager must be resolved by a jury.
[35]   The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 53 in its contemporaneous order. *See Order on Reqs. to Strike* at 19-20. For the reasons described in the Court's contemporaneous order, the Court also rejects Lantmännen's denial.
[36]   The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 54 in its contemporaneous order. *See Order on Reqs. to Strike* at 19-20.
  Lantmännen also interposes a qualified response. DRPSAMF ¶ 54. For the reasons described in its contemporaneous order, the Court declines to accept Lantmännen's qualified response.

after I left Lantmännen Unibake, I approached her earlier in 2021 to ask if she would consider coming to work with me at my new employer, Europastry." PSAMF ¶ 4; DRPSAMF ¶ 4.

In January of 2019, Mr. Minden left employment with Lantmännen. PSAMF ¶ 55; DRPSAMF ¶ 55. At that time, Jolien Demeyer worked for Lantmännen as the Senior Category and Digital Marketing Manager. PSAMF ¶ 57; DRPSAMF ¶ 57. Ms. Demeyer reported directly to Lantmännen's General Manager and President, Scott Kolinski. PSAMF ¶ 58; DRPSAMF ¶ 58. Ms. Demeyer highly recommended to Mr. Kolinski that Ms. Tucker replace Mr. Minden.[37] PSAMF ¶ 59; DRPSAMF ¶ 59. Ms. Demeyer said that Ms. Tucker "would have been perfect for the position."[38] PSAMF ¶ 60; DRPSAMF ¶ 60. Mr. Kolinski rejected Ms. Demeyer's recommendation of Ms. Tucker, saying that Lantmännen would never place a woman in the position.[39]

---

[37]     Lantmännen denies PSAMF ¶ 59, asserting that Ms. Demeyer testified via sworn declaration that she encouraged Ms. Tucker to apply for Mr. Minden's position but did not know why Ms. Tucker never did so. DRPSAMF ¶ 59 (citing *Stipulated R.*, Attach. 69, *Decl. of Jolien Demeyer* ¶ 13 (*Demeyer Decl.*)). Ms. Demeyer's statement does not respond to the contents of PSAMF ¶ 59 and the Court rejects Lantmännen's denial.

[38]     Lantmännen denies PSAMF ¶ 60, asserting that Ms. Demeyer testified via sworn declaration that she encouraged Ms. Tucker to apply for Mr. Minden's position but did not know why Ms. Tucker never did so. DRPSAMF ¶ 60 (citing *Demeyer Decl.* ¶ 13). Ms. Demeyer's statement does not respond to the contents of PSAMF ¶ 60 and the Court rejects Lantmännen's denial.

[39]     Lantmännen denies PSAMF ¶ 61. DRPSAMF ¶ 61. Lantmännen first points out that Ms. Demeyer testified that:

> I have been informed that Ms. Tucker claims that, during a conversation in 2019, I told her that Mr. Kolinski stated he would never place a woman in the Zone Manager position held by Mr. Minden. Ms. Tucker's claim is not true. I never told Ms. Tucker that Mr. Kolinski made such a statement. Further, I never heard Mr. Kolinski ma[k]e such a statement. I had conversations with Mr. Kolinski and Mr. Hoffmann about hiring Mr. Minden's replacement. Neither of them ever said they would not consider a woman for that role.

*Id.* (citing *Demeyer Decl.* ¶¶ 10-11). Lantmännen also represents that Mr. Kolinski has denied ever making such a statement. *Kolinski Dep.* at 33:19-34:1. In essence, Lantmännen denies PSAMF ¶ 61 because it has countervailing evidence that it finds more convincing. The Court, however, is required

PSAMF ¶ 61; DRPSAMF ¶ 61.   Mr. Hoffmann, Lantmännen's Director of Sales, claims that he asked Ms. Tucker if she would be interested in Mr. Minden's position. PSAMF ¶ 62; DRPSAMF ¶ 62.   Mr. Hoffmann's accusation is false, as he never asked Ms. Tucker if she was interested in Mr. Minden's position, told her to apply for the position, or offered her the position.[40]   PSAMF ¶ 63; DRPSAMF ¶ 63.

After Mr. Minden left, Lantmännen hired Greg Lutes to replace him as the Northeast Zone Manager.   DSMF ¶ 46; PRDSMF ¶ 46.   Mr. Lutes began employment with Lantmännen on February 11, 2019.   PSAMF ¶ 64; DRPSAMF ¶ 64.   Mr. Lutes was and still is responsible for the northeastern United States, from Michigan to Maine to Virginia.   DSMF ¶ 47; PRDSMF ¶ 47.   Mr. Lutes reported to Mr. Hoffmann. PSAMF ¶ 65; DRPSAMF ¶ 65.   Mr. Lutes' team of direct reports included John Stoops in the Mid-Atlantic region, Cherie Croteau in the Midwest, and Ms. Tucker, who covered Maine through New York.   DSMF ¶ 48; PRDSMF ¶ 48.   Ms. Tucker, Ms. Croteau, and Mr. Stoops were all Regional Sales Managers.   PSAMF ¶ 66; DRPSAMF ¶ 66.

The July 2019 "Monthly Executive Team Meeting" described corporate sales as:

- June was soft and concerned with overall health of business; all areas are soft.

---

to view conflicting evidence in the light most favorable to Ms. Tucker, and based on this precept, the Court rejects Lantmännen's denial.

[40]   Lantmännen denies PSAMF ¶ 63 on the ground that Mr. Hoffmann testified that he personally told Ms. Tucker that she should apply for Mr. Minden's position if she was interested. DRPSAMF ¶ 63 (citing *Hoffmann Dep.* at 23:25-24:8).   In essence, Lantmännen denies PSAMF ¶ 63 because it has countervailing evidence that it finds more convincing.   The Court, however, is required to view conflicting evidence in the light most favorable to Ms. Tucker, and based on this precept, the Court rejects Lantmännen's denial.

- Strongest declines in SE – Linda and Drew were terrible in June; but growth is not happening anywhere.
- Core business is eroding – Ralph will be doing a deep dive into issues.

PSAMF ¶ 67; DRPSAMF ¶ 67.  Lantmännen did not discipline Drew Wilson for his "terrible" sales in June of 2019.[41]  PSAMF ¶ 68; DRPSAMF ¶ 68.

In October 2019, Mr. Lutes emailed Ms. Tucker concerning the performance of the broker, stating "[w]e need to stop the bleeding on these accounts right now.  Each quarter has gone down more than the one before."[42]  DSMF ¶ 53; PRDSMF ¶ 53.  By Ms. Tucker's own characterization, her sales numbers were "not good" as of November 2019.[43]  DSMF ¶ 54; PRDSMF ¶ 54.  During the same timeframe, Mr. Lutes stated that in Ms. Tucker's market, "we were struggling mightily.  We were falling way behind the previous year and the activity from our broker and frankly from Rinda wasn't in line with what I felt we needed to do to get it right."  DSMF ¶ 55; PRDSMF ¶ 55.

### E.    Lantmännen Terminates Rinda Tucker's Employment

On November 19, 2019, Ms. Tucker hosted a showing at PFG in Springfield, Massachusetts.  PSAMF ¶ 69; DRPSAMF ¶ 69.  Mr. Lutes testified that as of the time

---

[41]    Lantmännen interposes a qualified response to PSAMF ¶ 68 on the ground that there is no evidence it has ever disciplined someone for a single bad sales month.  DRPSAMF ¶ 68.  It also reiterates its previous arguments that "there is no way to compare one salesperson with another."  *Id.* Despite Lantmännen's marshaling of countervailing evidence, the Court is required to view conflicting evidence in the light most favorable to Ms. Tucker, and it rejects Lantmännen's qualified response.

[42]    DSMF ¶ 53 states: "In October of 2019, Mr. Lutes emailed Plaintiff stating, '[w]e need to stop the bleeding on these accounts right now.  Each quarter has gone down more than the one before.'" Ms. Tucker admits that Mr. Lutes sent the October 2019 email.  PRDSMF ¶ 53.  However, she denies that the email was directed to her performance; rather she contends that Mr. Lutes' email was directed at the broker's performance.  *Id.*  Viewing disputed matters in the light most favorable to Ms. Tucker, the Court modified DSMF ¶ 53.

[43]    Ms. Tucker interposes a qualified response, adding that there were quite a few other salespeople whose numbers were not good.  PRDSMF ¶ 54.  The Court declines to accept this qualification because it is not directed at the asserted fact.

of the Springfield event, he had a good relationship with Ms. Tucker and never raised his voice at her.  PSAMF ¶ 69; DRPSAMF ¶ 69.  Mr. Lutes' assertion is false, as he had a troubled relationship with Ms. Tucker, and he frequently raised his voice at her.[44, 45]  PSAMF ¶ 70; DRPSAMF ¶ 70.  After the November 19, 2019 showing, Mr. Lutes sent Ms. Tucker an email regarding the Springfield event, in which he claimed that the presentation was "unorganized" and a "missed opportunity."  PSAMF ¶ 73; DRPSAMF ¶ 73.  Mr. Hoffmann then sent Mr. Lutes an email describing Mr. Lutes' email to Ms. Tucker as a "great recap!"  PSAMF ¶ 74; DRPSAMF ¶ 74.  Ms. Tucker pushed back strongly against Mr. Lutes' email, sending Mr. Lutes a detailed response which she feels forcefully disputed Mr. Lutes' assessment of the Springfield showing.[46]  PSAMF ¶ 75; DRPSAMF ¶ 75.

After the Springfield incident, Mr. Hoffmann and Mr. Lutes began to discuss terminating Ms. Tucker.[47]  PSAMF ¶ 76; DRPSAMF ¶ 76.  By early December of 2019, Mr. Lutes and Mr. Hoffmann were interviewing Valerie Embrey to replace Ms.

---

[44]    The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 70 in its contemporaneous order.  *See Order on Reqs. to Strike* at 21-22.

[45]    The Court addressed and granted Lantmännen's request to strike PSAMF ¶¶ 71-72 in its contemporaneous order.  *See Order on Reqs. to Strike* at 22-23.

[46]    Lantmännen interposes a qualified response to PSAMF ¶ 75.  DRPSAMF ¶ 75.  Lantmännen first denies that Ms. Tucker's email "forcefully disputed" Mr. Lutes' assessment but admits the document speaks for itself.  *Id.*  Lantmännen further admits that Ms. Tucker disagreed with Mr. Lutes that the Springfield meeting was a "missed opportunity," but contends she also wrote in the same email that the "first bread table did not go so well because we did not have the correct bread to match i.e., baguette. Which we will correct at the next bread cutting."  *Id.*

After some digging, the Court located Ms. Tucker's email under ECF Number 44, Attachment 22, which Ms. Tucker cited only as "*Tucker's response in bold print, Page ID# 507-11.*"  To respond to Lantmännen's objection to "forcefully disputed," the Court amended PSAMF ¶ 75 to clarify that this is Ms. Tucker's view of the email.

[47]    Lantmännen interposes a qualified response to PSAMF ¶ 76, contending  Mr. Lutes testified that he and Mr. Hoffmann decided to terminate Ms. Tucker in "late November 2019 into December of 2019."  DRPSAMF ¶ 76 (citing *Lutes Dep.* at 42:13-18).  The Court rejects Lantmännen's qualified response.  PSAMF ¶ 76 asserts when Mr. Hoffmann and Mr. Lutes began to discuss terminating Ms. Tucker, not when they made the decision.

Tucker.[48]  PSAMF ¶ 77; DRPSAMF ¶ 77.  During one interview with Ms. Embrey, Mr. Lutes told Ms. Embrey that one reason for Ms. Tucker's termination was that "she complained too much."[49]  PSAMF ¶ 78; DRPSAMF ¶ 78.  Mr. Hoffmann and Mr. Lutes did not inform Ms. Tucker that her job was in jeopardy.  PSAMF ¶ 79; DRPSAMF ¶ 79.

Mr. Hoffmann and Mr. Lutes decided to end Ms. Tucker's employment based on what they contend was her poor sales performance.[50]  DSMF ¶ 57; PRDSMF ¶ 57. On December 23, 2019, Lantmännen fired Ms. Tucker, then 59 years old.[51]  DSMF ¶ 61; PRDSMF ¶ 61.  Mr. Hoffmann and Mr. Lutes were both over 50 years old at the time, and in the same protected age category as Ms. Tucker.  DSMF ¶ 58; PRDSMF ¶ 58.  Mr. Hoffmann testified that he made the ultimate decision to end Ms. Tucker's

---

[48]    Lantmännen admits PSAMF ¶ 77 but adds some facts.  The Court declines to insert those facts because they contain no record citation and because they are not relevant to Lantmännen's admission of PSAMF ¶ 77.

[49]    Lantmännen interposes a qualified response to PSAMF ¶ 78.  DRPSAMF ¶ 78.  Although Lantmännen admits that Ms. Embrey made this accusation during her deposition, it denies that Mr. Lutes ever made the statement.  *Id.*  Lantmännen then argues that "even accepting Ms. Embrey's allegation as true is not dispositive of any of Plaintiff's claims" because terminating an employee "for complaining too much is not unlawful unless the complaints warrant whistleblower protection, which Plaintiff's did not."  *Id.*  The Court rejects Lantmännen's qualified response because the Court is required to view conflicting evidence in the light most favorable to Ms. Tucker.  Lantmännen's points about the legality of terminating an employee for complaints are immaterial to PSAMF ¶ 78.

[50]    Lantmännen's introduction to DSMF ¶ 57 reads, "As a result of Plaintiff's poor sales performance."  DSMF ¶ 57.  Ms. Tucker denies that the reason for her termination was her sales performance.  PRDSMF ¶ 57.  Viewing disputed matters in the light most favorable to the nonmovant, the Court has amended DSMF ¶ 57 to reflect that the reason offered for Ms. Tucker's termination is Lantmännen's contention.

[51]    DSMF ¶ 62 then asserts that as a result of Ms. Tucker's firing, her husband threatened to kill Mr. Lutes.  DSMF ¶ 62.  Ms. Tucker objects on the ground of relevance.  PRDSMF ¶ 62.  The Court agrees and has not included DSMF ¶ 62.

employment after consultation with Mr. Lutes and based the decision solely on Ms.

Tucker's sales figures. [52]   DSMF ¶ 59; PRDSMF ¶ 59.   Mr. Hoffmann explained:

> Q. Well, how did this come about, I mean did Lutes come to you and say,
> hey, we need to get rid of Rinda, did you go to him, how did the process
> play out?
>
> A. It's a numbers game.   We are in sales.   It's all about numbers.
>
> Q. Well, tell me how the process worked out then.
>
> A. Okay.   You monitor a person, you monitor the overall sales, sales
> development in the market, and from then, you decide whether the
> person has the capability of growing the market or not.

DSMF ¶ 59; PRDSMF ¶ 59.   As Mr. Lutes explained during his deposition, "I believe

that a key metric in measurement of any regional sales manager is the ability to meet

their sales targets, yes."   DSMF ¶ 60; PRDSMF ¶ 60.

At the time of Ms. Tucker's termination, every employee in the sales

department was over 40 years old, with the average age of the sales department being

54.75 years old, including four females over the age of 60.   DSMF ¶ 63; PRDSMF ¶

63.   Ms. Tucker was not the only individual fired for poor performance in 2019.   DSMF

¶ 64; PRDSMF ¶ 64.   On October 31, 2019, Lantmännen fired Anthony Mangano, a

62-year-old male, for poor sales performance.   DSMF ¶ 65; PRDSMF ¶ 65.

Lantmännen also contends that on December 31, 2019, it fired John Stoops, a 50-

year-old male, for what it contends was poor sales performance.[53]   DSMF ¶ 66;

---

[52]      Ms. Tucker admits that Mr. Hoffmann and Mr. Lutes terminated her, but she denies that the
reason for her termination was poor sales.   PRDSMF ¶ 59.   The Court declines to accept Ms. Tucker's
denial because it goes beyond the scope of DSMF ¶ 59.
[53]      DSMF ¶ 66 states: "On December 31, 2019, Lantmännen fired J.S., age 50 male, for poor sales
performance."   DSMF ¶ 66.   Ms. Tucker denies DSMF ¶ 66, contending that Mr. Stoops was terminated
in 2020 and that Lantmännen terminated Mr. Stoops for a "collection of reasons."   PRDSMF ¶ 66.

PRDSMF ¶ 66.  At the times of their respective terminations, Ms. Tucker was 10.8% below target, Mr. Mangano was 19.8% below target, and Mr. Stoops was 6.7% below target.[54]  DSMF ¶ 67; PRDSMF ¶ 67.  Mr. Stoops worked under Mr. Lutes in the same Zone as Ms. Tucker.  DSMF ¶ 68; PRDSMF ¶ 68.

On or about July 8, 2019, Mr. Hoffmann told Ms. Tucker, "You're getting older, the kids are grown . . . now that your kids are grown and you are getting older, maybe the job is too much for you."[55, 56]  PSAMF ¶ 127; DRPSAMF ¶ 127.  On or about

---

The summary judgment record contains conflicting information about when Mr. Stoops was fired.  According to Lantmännen's Employee Termination Census, Mr. Stoops was fired on December 31, 2019.  *Def.'s R.*, Attach. 9, *Lantmännen Employee Termination Census*.  However, Mr. Hoffmann testified in his deposition that Mr. Stoops was terminated in 2020.  *Hoffmann Dep.* at 33:22-34:5.  In light of its obligation to view disputed facts in the light most favorable to Ms. Tucker, the Court has amended DSMF ¶ 66 to reflect that the date on which Mr. Stoops was fired is Lantmännen's contention.

In support of her contention that Mr. Stoops was terminated for reasons other than just poor sales, Ms. Tucker cites a portion of Mr. Lutes' deposition, during which the following exchange took place:

Q. Okay. Was there a specific reason for Stoops' termination?
A. A specific reason, no.  It was a collection of sales data and performance issues.
Q. What were the performance issues aside from sales?
A. I don't recall all of them, but again related to the metrics that I pointed out earlier, CRM Management, sales numbers.

*Lutes Dep.* at 42:5-12.  Based on Mr. Lutes' testimony, it appears Lantmännen terminated Mr. Stoops both for poor sales performance and for his "CRM Management."  The Court has therefore amended DSMF ¶ 66 to reflect that the reason for Mr. Stoops' termination is Lantmännen's contention.

[54]   Ms. Tucker interposes a qualified response to DSMF ¶ 67, adding that Mr. Lutes was 16.8% below target and Mr. Swindle was 16.0% below target.  PRDSMF ¶ 67.  The Court rejects Ms. Tucker's qualification as outside the scope of the fact asserted.

[55]   PSAMF ¶¶ 122-26 assert that Mr. Lutes made ageist comments to Ms. Tucker and verbally abused her.  Lantmännen requested that the Court strike each of these paragraphs because for record support, Ms. Tucker has cited only the allegations in her unverified complaint.  DRPSAMF ¶¶ 122-26.  The Court addressed and granted Lantmännen's requests to strike PSAMF ¶¶ 122-26 in its contemporaneous order.  *See Order on Reqs. to Strike* at 28-30.

[56]   Lantmännen denies PSAMF ¶ 127, pointing out that Mr. Hoffmann testified that he had never made such statement.  DRPSAMF ¶ 127 (citing *Hoffmann Dep.* at 35:11-16).  Lantmännen also cites Mr. Hoffmann's testimony that anytime he spoke to employees about their age or how long they intended to work, it was so the company could prepare for their retirement years in advance.  *Id.* (citing *Hoffmann Dep.* at 35:14-25).  According to Lantmännen, the First Circuit has stated that "[a]n employer may legitimately inquire about an employee's plans so that it can prepare to meet its hiring needs."  *Id.* (quoting *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 28-29 (1st Cir. 1995)).  Finally,

25

August 12, 2019, Mr. Hoffmann told Ms. Tucker, "You are getting older, and maybe you are slowing down."[57]  PSAMF ¶ 128; DRPSAMF ¶ 128.  On or about August 28, 2019, Mr. Hoffmann said, "We need to clean house and get young blood."[58]  PSAMF ¶ 129; DRPSAMF ¶ 129.

Heather Bryant worked for Lantmännen as a Zone Sales Manager from August 2017 through July 2020.  PSAMF ¶ 132; DRPSAMF ¶ 132.  Referring to the food service industry in the southeast, Ms. Bryant testified that the industry:

> Has for a very long time been dominated by the white middle-aged male and they do not like to make room . . . it's difficult for a woman to be successful in this industry, and it has gotten much better but there is still a very long way to go.[59]

PSAMF ¶ 133; DRPSAMF ¶ 133.  Women are allowed to work in the food service industry, but they are expected to "be seen and not heard."[60]  PSAMF ¶ 134;

---

Lantmännen points out that Ms. Tucker's own witness, Ms. Bryant, denied ever hearing Mr. Hoffmann make ageist comments.  *Id.* (citing *Stipulated R.*, Attach. 58, *Dep. of Heather Bryant* at 17:22-24 (*Bryant Dep.*)).  The Court declines to accept Lantmännen's denial, which essentially argues countervailing facts, because the Court is required to view conflicting facts in the light most favorable to Ms. Tucker.

[57]  Lantmännen denies PSAMF ¶ 128 for the same reasons set forth in its denial of PSAMF ¶ 127.  DRPSAMF ¶ 128.  For the same reasons the Court explained in its ruling on PSAMF ¶ 127, the Court declines to accept Lantmännen's denial of PSAMF ¶ 128.

[58]  Lantmännen denies PSAMF ¶ 129 for the same reasons set forth in its denial of PSAMF ¶ 127.  DRPSAMF ¶ 129.  For the same reasons the Court explained in its ruling on PSAMF ¶ 127, the Court declines to accept Lantmännen's denial of PSAMF ¶ 129.

[59]  The introduction to PSAMF ¶ 133 reads, "Bryant testified that the food service industry."  PSAMF ¶ 133.  Lantmännen interposes a qualified response to PSAMF ¶ 133, pointing out that Ms. Bryant qualified her testimony by stating, "I can only speak for food service in the southeast.  I do think, much like everything else in this country, it's different from place to place."  DRPSAMF ¶ 133 (citing *Bryant Dep.* at 41:3-15).  The Court reviewed the cited deposition and agrees with Lantmännen that Ms. Bryant qualified her observation by noting that she could only speak about food service in the southeast.  The Court has slightly amended PSAMF ¶ 133.

[60]  Lantmännen denies PSAMF ¶ 134 and requests that the Court strike it.  DRPSAMF ¶ 134.  The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 134 in its contemporaneous order.  *See Order on Reqs. to Strike* at 30.  Lantmännen also posits countervailing evidence of its employment of women, but the Court is required to view conflicting evidence in the light most favorable to Ms. Tucker.  Therefore, the Court declines to accept Lantmännen's denial.

DRPSAMF ¶ 134.  During sales meetings, when Ms. Tucker or other female salespersons spoke, Mr. Hoffmann often interrupted them and cut short their presentations.[61]  PSAMF ¶ 135; DRPSAMF ¶ 135.  When female salespersons made suggestions, Mr. Hoffmann would often treat the suggestions with indifference or not offer any encouragement; however, Mr. Hoffmann did not cut off male sales staff or treat their suggestions with indifference.[62]  PSAMF ¶ 136; DRPSAMF ¶ 136.  Mr. Hoffmann encouraged male salespersons to speak and offered encouragement to their sales suggestions.[63]  PSAMF ¶ 137; DRPSAMF ¶ 137.

Ms. Tucker pushed back against Mr. Lutes on November 21, 2019, and within days, Mr. Lutes and Mr. Hoffmann decided to terminate Ms. Tucker due to her pushback.[64]  PSAMF ¶ 138; DRPSAMF ¶ 138.  Mr. Lutes would yell at Ms. Tucker and make demeaning comments, but Ms. Tucker never heard him speak in that manner to any male salespersons.[65]  PSAMF ¶ 139; DRPSAMF ¶ 139.  Ms. Tucker

---

[61]    Lantmännen denies PSAMF ¶ 135 and requests that the Court strike it.  DRPSAMF ¶ 135. The Court addressed Lantmännen's request to strike PSAMF ¶ 135 in its contemporaneous order.  *See Order on Reqs. to Strike* at 30-31.  For the reasons in the Court's contemporaneous order, the Court declines to strike PSAMF ¶ 135 or to accept Lantmännen's denial.

[62]    Lantmännen denies PSAMF ¶ 136 and requests that the Court strike it.  DRPSAMF ¶ 136. The Court addressed Lantmännen's request to strike PSAMF ¶ 136 in its contemporaneous order.  *See Order on Reqs. to Strike* at 30-31.  For the reasons in the Court's contemporaneous order, the Court declines to strike PSAMF ¶ 136 or to accept Lantmännen's denial.

[63]    Lantmännen denies PSAMF ¶ 137 and requests that the Court strike it.  DRPSAMF ¶ 137. The Court addressed Lantmännen's request to strike PSAMF ¶ 137 in its contemporaneous order.  *See Order on Reqs. to Strike* at 30-31.  For the reasons in the Court's contemporaneous order, the Court declines to strike PSAMF ¶ 137 or to accept Lantmännen's denial.

[64]    Lantmännen denies PSAMF ¶ 138 and requests that the Court strike it.  DRPSAMF ¶ 138. The Court addressed Lantmännen's request to strike PSAMF ¶ 138 in its contemporaneous order.  *See Order on Reqs. to Strike* at 30-31.  For the reasons in the Court's contemporaneous order, the Court declines to strike PSAMF ¶ 138 or to accept Lantmännen's denial.

[65]    Lantmännen denies PSAMF ¶ 139 and requests that the Court strike it.  DRPSAMF ¶ 139. The Court addressed Lantmännen's request to strike PSAMF ¶ 139 in its contemporaneous order.  *See Order on Reqs. to Strike* at 30-31.  For the reasons in the Court's contemporaneous order, the Court declines to strike PSAMF ¶ 139 or to accept Lantmännen's denial.

complained to Mr. Hoffmann about how Mr. Lutes spoke to her, but Mr. Hoffmann did not take any actions in response.[66, 67]   PSAMF ¶ 140; DRPSAMF ¶ 140.

At the time of her termination, in Ms. Tucker's view, she was performing successfully.[68]   PSAMF ¶ 80; DRPSAMF ¶ 80.   Six days prior to her termination, Ms. Tucker landed a new customer, prompting Mr. Hoffmann to email her for doing a "great job."[69]   PSAMF ¶ 81; DRPSAMF ¶ 81.   At the time of her termination, Ms. Tucker thought she was doing a good job selling products, but then she lost a major client which went into Chapter 11 bankruptcy.[70]   PSAMF ¶ 82; DRPSAMF ¶ 82.   Ms. Tucker's numbers were increasing and had never been better in Boston and at PFG

---

[66]   Lantmännen denies PSAMF ¶ 140 and requests that the Court strike it.   DRPSAMF ¶ 140. The Court addressed Lantmännen's request to strike PSAMF ¶ 140 in its contemporaneous order.   *See Order on Reqs. to Strike* at 31.   For the reasons in the Court's contemporaneous order, the Court declines to strike PSAMF ¶ 140 or to accept Lantmännen's denial.

[67]   PSAMF ¶¶ 141-44 assert that Mr. Lutes harassed Ms. Tucker and verbally abused her. Lantmännen requested that the Court strike each of these paragraphs because for record support, Ms. Tucker only cited the allegations in her unverified complaint.   DRPSAMF ¶¶ 141-44.   The Court addressed and granted Lantmännen's requests to strike PSAMF ¶¶ 141-44 in its contemporaneous order.   *See Order on Reqs. to Strike* at 28-30.   The Court also strikes PSAMF ¶ 145 because without the preceding paragraphs from PSAMF ¶¶ 141-44, it has lost its context and makes no sense.

[68]   Lantmännen denies PSAMF ¶ 80, noting that Ms. Tucker admitted her sales numbers were "not good" as of a few weeks before her termination.   DRPSAMF ¶ 80 (citing *Stipulated R.*, Attach. 1, *Dep. of Rinda Tucker - Oct. 8, 2021* at 21:15-18 (*Oct. Tucker Dep.*)).   Lantmännen also claims that Ms. Tucker testified "that she did not meet her sales targets in 2017, nor 2018, nor 2019."   *Id.* (citing *Oct. Tucker Dep.* at 12:1-12).   According to Lantmännen, Ms. Tucker "missed her total sales goals by a total of approximately $1.37 million" between 2017 and 2019.   *Id.*

Again, Lantmännen is responding to Ms. Tucker's facts with other facts, but the Court is required to view disputed facts in the light most favorable to Ms. Tucker.   The Court amended PSAMF ¶ 80 to clarify that the statement is Ms. Tucker's opinion, not a binding fact.

[69]   Lantmännen denies PSAMF ¶ 81, stating that it is "not aware of any such email."   DRPSAMF ¶ 81.   Further, Lantmännen contends that signing up a new customer "does not excuse the rest of Plaintiff's failure to meet her sales targets from 2017 to 2019."   *Id.* (citing *Oct. Tucker Dep.* at 73:14-23).   Lantmännen is again arguing that conflicting facts entitle it to summary judgment.   That is not the law.   The law requires the Court to view conflicting facts in the light most favorable to Ms. Tucker. The Court declines to accept Lantmännen's denial of PSMAF ¶ 81.

[70]   Lantmännen admits in part and denies in part PSAMF ¶ 82.   Lantmännen admits that one of Ms. Tucker's clients went bankrupt in 2019 but denies that she was "doing a good job selling products," claiming that even Ms. Tucker admitted during her deposition that she knew this was not true.   *Id.*

Once again, the Court declines to accept Lantmännen's denial because the Court is required to view conflicting evidence in the light most favorable to Ms. Tucker, but the Court amended PSAMF ¶ 82 to clarify that Ms. Tucker thought she was doing a good job at the time of her termination.

in Maine.[71]  PSAMF ¶ 83; DRPSAMF ¶ 83.  In 2019, Lantmännen had increased Ms.

Tucker's sales goals significantly by 11.4%.[72]  PSAMF ¶ 84; DRPSAMF ¶ 84.  Ms.

Tucker increased sales over the previous year.[73]  PSAMF ¶ 85; DRPSAMF ¶ 85.

According to the sales report that the Court ordered Lantmännen to produce,

fourteen out of Lantmännen's fifteen salespersons did not meet their sales goals in

2019.[74]  PSAMF ¶ 86; DRPSAMF ¶ 86.  Mr. Lutes missed his 2019 sales goal by

$848,689; Ms. Tucker's shortfall equaled $699,394.[75]  PSAMF ¶ 87; DRPSAMF ¶ 87.

---

[71]     Lantmännen denies PSAMF ¶ 83, noting that Ms. Tucker's year-to-date case sales in October 2019 were down 3,261 cases compared to the prior year.  DRPSAMF ¶ 83.  Lantmännen also makes the same points in its response to PSAMF ¶ 83 that it made in response to PSAMF ¶ 82.  As the Court interprets Ms. Tucker's testimony, she explained that but for the bankruptcy of a distributor, her numbers were increasing.  Again, the Court is required to view conflicting evidence in the light most favorable to Ms. Tucker and declines to accept Lantmännen's denial.

[72]     Lantmännen denies PSAMF ¶ 84, contending that it only increased Ms. Tucker's sales goal by 9.45%.  DRPSAMF ¶ 84 (citing *Def.'s R.*, Attach. 8, *Master Sales Performance Chart*).  In her affidavit, Ms. Tucker says that Lantmännen increased her sales goal by 11.4%.  *Tucker Aff.* ¶ 8.  Although she does not explain how she arrived at this percentage increase, Ms. Tucker's sworn affidavit is sufficient for consideration at the summary judgment stage, and the Court is required to view conflicting evidence in the light most favorable to her.  The Court declines to accept Lantmännen's denial of PSAMF ¶ 84.

Additionally, Lantmännen's affirmative assertion that other salespersons saw greater increases of 10% and 11% is beyond the scope of PSAMF ¶ 84.

[73]     Lantmännen interposes a qualified response to PSAMF ¶ 85.  DRPSAMF ¶ 85.  While Lantmännen acknowledges that Ms. Tucker did increase her gross sales in 2019,  it proffers that she missed her sales target by a greater percentage.  *Id.* (citing *Def.'s R.*, Attach. 8, *Master Sales Performance Chart*).  As this qualification is beyond the scope of the fact asserted, the Court declines to accept it.

[74]     Lantmännen interposes a qualified response to PSAMF ¶ 86.  DRPSAMF ¶ 86.  First, Lantmännen objects to "Plaintiff's insinuation that Lantmännen somehow withheld evidence" as inappropriate and incorrect.  *Id.*  The Court overrules Lantmännen's objection.

Lantmännen also argues that "it is telling that Plaintiff fails to mention that another member of her Zone overseen by Mr. Lutes, [Mr. Mangano], was also fired in 2019 for missing his sales target by 19.1%."  *Id.* (citing *Hoffmann Dep.* at 29:11-18; and *Def.'s R.*, Attach. 9, *Employee Termination Census*).  The Court declines to consider Lantmännen's proffered evidence concerning Mr. Mangano because it is beyond the scope of PSAMF ¶ 86.

[75]     PSAMF ¶ 87 reads: "Lutes missed his 2019 sales goal by just under a million dollars, almost double Tucker's sales shortfall."

Lantmännen denies PSAMF ¶ 87, arguing about whether Mr. Lutes' shortfall can properly be characterized as "just under a million dollars" and whether his shortfall was almost double that of Ms. Tucker.  DRPSAMF ¶ 87.  Rather than join the parties' adjectival dispute about how to characterize the respective shortfalls, the Court has inserted the actual shortfall numbers from Lantmännen's spreadsheet.  The Court disregards Lantmännen's other points as argumentative.

In addition to the overall decrease in sales companywide, Ms. Tucker lost two major accounts, which significantly impacted her numbers.[76]  PSAMF ¶ 88; DRPSAMF ¶ 88.  Despite the drop in sales, at the time of Ms. Tucker's termination her sales were on the upswing, and she had just signed up a major account.[77]  PSAMF ¶ 89; DRPSAMF ¶ 89.

Prior to Ms. Tucker's termination, Lantmännen had not taken "any disciplinary actions against" her.  PSAMF ¶ 90; DRPSAMF ¶ 90.  Mr. Lutes testified that he was not even aware of Lantmännen's PDP.  PSAMF ¶ 91; DRPSAMF ¶ 91.  Mr. Hoffmann testified that he did not even know Lantmännen maintained a PDP.[78]  PSAMF ¶ 92; DRPSAMF ¶ 92.

---

[76]     Lantmännen interposes a qualified response to PSAMF ¶ 88, explaining its efforts to help Ms. Tucker mitigate the impact of the loss of these accounts.  DRPSAMF ¶ 88.  The Court declines to accept Lantmännen's qualified response because it is beyond the scope of PSAMF ¶ 88.

[77]     Lantmännen denies PSAMF ¶ 89 and requests the Court to strike it.  DRPSAMF ¶ 89. The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 89 in its contemporaneous order.  *See Order on Reqs. to Strike* at 23-24.

Regarding Lantmännen's denial, which is based on other facts favorable to its position, the Court is required to view conflicting facts in the light most favorable to Ms. Tucker and therefore declines to accept Lantmännen's denial.

[78]     PSAMF ¶ 92 reads: "Hoffman[n] testified that he did not even know Defendant did not maintain a PDP."  PSAMF ¶ 92.  Lantmännen denies PSAMF ¶ 92, contending that Ms. Tucker mischaracterized Mr. Hoffmann's testimony.  DRPSAMF ¶ 92.  According to Lantmännen, Mr. Hoffmann testified that "discipline depended on the severity of the conduct and could include a warning, suspension, or termination."  *Id.* (citing *Hoffmann Dep.* at 13:9-14:3).

Lantmännen's denial is frivolous.  Mr. Hoffmann's deposition contains the following colloquy:

Q. Do you know what a progressive discipline policy is?
A. No.
Q. Did the company have various steps of discipline which it would issue to employees for their job performance such as coaching, a verbal warning, a written warning?
A. Not really, we do not have such in place.

*Hoffmann Dep.* at 13:2-8.  Mr. Hoffmann's own testimony confirms the basis for PSAMF ¶ 92.  Mr. Hoffmann's later testimony that discipline would depend upon the severity of the conduct does not contradict PSAMF ¶ 92's statement that Mr. Hoffmann was unaware that Lantmännen had a written progressive discipline policy, and the Court does not accept Lantmännen's denial.

Kathy Komerska, Lantmännen's Human Resources Manager, testified that Lantmännen "dismissed [Ms. Tucker] for various reasons."[79]   PSAMF ¶ 93; DRPSAMF ¶ 93.  Mr. Hoffmann claims that beginning in late 2018, Ms. Tucker "lost her drive, her ambition, and that came to the forefront as she said she does not really need to work."[80]  PSAMF ¶ 94; DRPSAMF ¶ 94.  Mr. Hoffmann's assertion is false; from late 2018 until her termination, Ms. Tucker continued to diligently work her accounts and never lost her ambition.[81]  PSAMF ¶ 95; DRPSAMF ¶ 95.

Mr. Lutes testified that he had between six and eight discussions with Ms. Tucker about entering her day-to-day activities into the CRM system.  PSAMF ¶ 96; DRPSAMF ¶ 96.  Mr. Lutes' assertions are false as he never had a discussion with

---

[79]     Lantmännen interposes a qualified response to PSAMF ¶ 93.  DRPSAMF ¶ 93.  Lantmännen first points out that Ms. Komerska testified that she was not involved in the decision-making process to terminate Ms. Tucker.  *Id.* (citing *Stipulated R.*, Attach. 52, *Dep. of Kathleen A. Komerska* at 11:1-3 (*Komerska Dep.*)).  Lantmännen also represents that when "asked what the 'various reasons' for Plaintiff's termination were, Ms. Komerska stated that '[p]erformance was number one.'"  *Id.* (citing *Komerska Dep.* at 11:20-2).  The Court reviewed the cited portion of Ms. Komerska's deposition transcript and confirmed that she did testify that Ms. Tucker was being dismissed "for various reasons" as PSAMF ¶ 93 states.  Lantmännen's additional facts are beyond the scope of PSAMF ¶ 93 and the Court has not considered them.

[80]     Lantmännen interposes a qualified response to PSAMF ¶ 94.  DRPSAMF ¶ 94.  First, Lantmännen asserts that "[t]his Statement does not accurately recite Mr. Hoffmann's testimony and a key portion is omitted."  On the inaccuracy issue, the Hoffmann transcript states:

> Q. With regard to Tucker, did you consider any extenuating circumstances as to why her sales were not what you wanted?
> A. I felt that she had lost her drive, her ambition, and that came over to the forefront as she more than once mentioned that she does not really need to work.

*Hoffmann Dep.* at 29:22-30:2.  The Court rejects Lantmännen's allegation that PSAMF ¶ 94 does not accurately recite Mr. Hoffmann's testimony.  Clearly, it does.

Instead of identifying an inaccuracy, Lantmännen proffers a broader explanation for why Mr. Hoffmann made this statement.  In doing so, Lantmännen should not have denied the accuracy of PSAMF ¶ 94 and its new facts are beyond the scope of PSAMF ¶ 94.  The Court does not consider them.

[81]     Lantmännen denies PSAMF ¶ 95 and requests the Court to strike it.  DRPSAMF ¶ 95.  The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 95 in its contemporaneous order.  *See Order on Reqs. to Strike* at 24.  The Court rejects Lantmännen's denial since it is based on the erroneous premise that Ms. Tucker's affidavit is inadmissible.

Ms. Tucker about her failure to enter day to day activities into the CRM system.[82]

PSAMF ¶ 97; DRPSAMF ¶ 97. Ms. Tucker did input all her entries into the CRM

system.[83] PSAMF ¶ 98; DRPSAMF ¶ 98.

In December of 2021, Ms. Tucker requested a discovery conference with the

Court to compel Lantmännen to produce all of Ms. Tucker's entries into the CRM

system. PSAMF ¶ 99; DRPSAMF ¶ 99. On February 10, 2022, the Court held a

discovery conference and ordered Lantmännen to produce all of Ms. Tucker's entries

into the CRM system in 2019.[84] PSAMF ¶ 100; DRPSAMF ¶ 100. In response to the

Court's order, Lantmännen produced a single page allegedly containing Ms. Tucker's

entries into the CRM system.[85] PSAMF ¶ 101; DRPSAMF ¶ 101. To conduct further

discovery into Lantmännen's efforts to retrieve Ms. Tucker's entries into the CRM

system, Ms. Tucker issued a Federal Rule of Civil Procedure 30(b)(6) deposition.

PSAMF ¶ 102; DRPSAMF ¶ 102. After service of the 30(b)(6) deposition,

---

[82]     Lantmännen denies PSAMF ¶ 97 and requests that the Court strike it. DRPSAMF ¶ 97. The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 97 in its contemporaneous order. *See on Order on Reqs. to Strike* at 25-26. The Court rejects Lantmännen's denial because it is based on the erroneous assumption that Ms. Tucker's affidavit is inadmissible and because Lantmännen's countervailing evidence presents factual disputes that the Court is obligated to view in the light most favorable to Ms. Tucker.

[83]     Lantmännen denies PSAMF ¶ 98 and requests that the Court strike it. DRPSAMF ¶ 98. The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 98 in its contemporaneous order. *See Order on Reqs. to Strike* at 24-26. The Court rejects Lantmännen's denial because it is based on the erroneous assumption that Ms. Tucker's affidavit is inadmissible and because Lantmännen's countervailing evidence presents factual disputes that the Court is obligated to view in the light most favorable to Ms. Tucker.

[84]     Lantmännen interposes a qualified response to PSAMF ¶ 100. DRPSAMF ¶ 100. Effectively Lantmännen reargues its position that led to the Magistrate Judge's February 10, 2022 Order (ECF 26). *See id.* Lantmännen's explanation does not negate the accuracy of PSAMF ¶ 100, and the Court does not accept Lantmännen's qualified response.

[85]     Lantmännen interposes a qualified response to PSAMF ¶ 101, once again taking issue with "Plaintiff's attempt to portray Lantmännen as hiding CRM data." DRPSAMF ¶ 101. Again, Lantmännen's explanation does not negate the accuracy of PSAMF ¶ 101, and the Court does not accept Lantmännen's qualified response.

Lantmännen produced an additional fifty-six pages of Ms. Tucker's entries into the CRM system.[86]  PSAMF ¶ 103; DRPSAMF ¶ 103.  Lantmännen designated Mr. Lutes as its 30(b)(6) representative on the following issues:

- All discussions between [Ms. Tucker] and [Lantmännen's] management for not making sufficient entries into the CRM system.
- Documentation of all discussions between [Ms. Tucker] and [Lantmännen's] management for not making sufficient entries in 2019 into the CRM system.

PSAMF ¶ 106; DRPSAMF ¶ 106.  Mr. Lutes testified that he did a search for any responsive documents, but he could not find any documentation of any discussions with Ms. Tucker for not making sufficient entries into the CRM system.  PSAMF ¶ 107; DRPSAMF ¶ 107.

Mr. Lutes also testified that on five or six occasions he issued and documented to Ms. Tucker "Plans to correct deficiencies."  PSAMF ¶ 104; DRPSAMF ¶ 104.  Mr. Lutes' assertion is false; he never had a discussion with Ms. Tucker about plans to correct deficiencies.[87]  PSAMF ¶ 105; DRPSAMF ¶ 105.

At the time of Ms. Tucker's termination, she thought that quite a few regional managers had lower sales numbers than her.[88]  PSAMF ¶ 108; DRPSAMF ¶ 108.  In 2019, salesperson Drew Wilson fell $703,006.00 short of his sales goal.  PSAMF ¶

---

[86]     Lantmännen interposes a qualified response to PSAMF ¶ 103, reiterating the arguments it made in response to PSAMF ¶ 101.  DRPSAMF ¶ 103.  Again, Lantmännen's explanation does not negate the accuracy of PSAMF ¶ 103, and the Court does not accept Lantmännen's qualified response.

[87]     Lantmännen denies PSAMF ¶ 105 and requests that the Court strike it.  DRPSAMF ¶ 105.  The Court addressed and denied Lantmännen's request to strike PSAMF ¶ 105 in its contemporaneous order.  *See Order on Reqs. to Strike* at 26-27.  The Court rejects Lantmännen's denial because it is based on the erroneous assumption that Ms. Tucker's affidavit is inadmissible.

[88]     Lantmännen interposes a qualified response to PSAMF ¶ 108, in which it seizes upon the phrase "quite a few" and vigorously disputes it.  DRPSAMF ¶ 108.  This phrase comes from Ms. Tucker's deposition and to puncture the dispute, the Court amended PSAMF ¶ 108 to clarify that the phrase reflects Ms. Tucker's belief.  The Court does not accept Lantmännen's qualified response.

109; DRPSAMF ¶ 109.  Lantmännen did not discipline Mr. Wilson for falling short of his 2019 sales goal.[89]  PSAMF ¶ 110; DRPSAMF ¶ 110.  Mr. Hoffmann admitted that Mr. Wilson has had issues with lack of sales, but Lantmännen has never disciplined Mr. Wilson for this.  PSAMF ¶ 111; DRPSAMF ¶ 111.

In its submission to the Maine Human Rights Commission (MHRC), Lantmännen provided a list of fourteen salespersons, who may or may not be similarly situated to Ms. Tucker in varying degrees, as of January 2020.[90]  PSAMF ¶ 112; DRPSAMF ¶ 112.  In this list, Lantmännen identified the "SE Zone Manager" as Mr. Wilson, who was forty-five years old at the time.  PSAMF ¶¶ 113-14; DRPSAMF ¶¶ 113-14.  In 2019, salesperson Eric Ingraham fell $748,121.00 short of his sales goal.  PSAMF ¶115; DRPSAMF ¶ 115.  Lantmännen did not discipline Mr. Ingraham for falling short of his 2019 sales goal.[91, 92]  PSAMF ¶ 116; DRPSAMF ¶

---

[89]     Lantmännen interposes a qualified response to PSAMF ¶ 110, seeking to explain why it did not discipline Mr. Wilson for falling short of his 2019 sales goal.  DRPSAMF ¶ 110.  Lantmännen's explanations are beyond the scope of PSAMF ¶ 110 and the Court has not considered them.  The Court does not accept Lantmännen's qualified response.

[90]     Lantmännen interposes in part a qualified response and in part a denial to PSAMF ¶ 112.  DRPSAMF ¶ 112.  Lantmännen repeatedly denies that any of its salespeople could be comparable to Ms. Tucker because they each have different routes and different roles in different parts of the country.  *Id.*  Although the Court understands Lantmännen's point, differences among Lantmännen salespeople could not be so profound that no salesperson at Lantmännen is in any way comparable to any other salesperson.  For purposes of summary judgment, the Court views these differences in the light most favorable to Ms. Tucker and rejects Lantmännen's attempt to insulate itself from an analysis of comparable employees.  The Court does not accept Lantmännen's denial or its qualified response, but the Court amended PSAMF ¶ 112 to indicate that the other salespeople may or may not be comparable in varying degrees.

[91]     Lantmännen interposes a qualified response to PSAMF ¶ 116, explaining why it did not discipline Mr. Ingraham.  DRPSAMF ¶ 116.  The Court rejects Lantmännen's qualified response as beyond the scope of PSAMF ¶ 116.

[92]     PSAMF ¶ 117 states: "In 2019, salesman Frank Swindle fell $650,362.00 short of his sales goal."  Lantmännen requests that the Court strike PSAMF ¶ 117 on the ground that it is demonstrably false since Mr. Swindle exceeded his sales goal by $650,362.  DRPSAMF ¶ 117 (citing *Def.'s R.,* Attach. 8, *Master Sales Performance Chart*).  The Court addressed and granted Lantmännen's request to strike in its contemporaneous order.  *See Order on Reqs. to Strike* at 27-28.  The Court also eliminated PSAMF ¶ 118 because it is erroneously based on PSAMF ¶ 117.

116.   In 2019, Mr. Lutes fell $848,689.00 short of his sales goal.[93]   PSAMF ¶ 119;

DRPSAMF ¶ 119.   Lantmännen did not discipline Mr. Lutes for falling short of his

2019 sales goal.[94]   PSAMF ¶ 120; DRPSAMF ¶ 120.   Mr. Hoffmann testified that in

2019, aside from Ms. Tucker, he only terminated the in-store bakery sales manager,

Tony Mangano, for lack of sales.[95]   PSAMF ¶ 121; DRPSAMF ¶ 121.

   Following the separations of Ms. Tucker and Mr. Stoops from the Northeast

Zone, the only remaining direct report of Mr. Lutes was Ms. Croteau, a 65-year-old

female, who is still employed by Lantmännen and still reports to Mr. Lutes.   DSMF

¶ 69; PRDSMF ¶ 69.   In early 2020, Mr. Lutes filled the openings on his team by

hiring Ms. Embrey, a 63-year-old female.   DSMF ¶ 70; PRDSMF ¶ 70.   Ms. Embrey

testified that Mr. Lutes brought her in to "clean up the territory for Mid-Atlantic,"

which was Mr. Stoops's region.[96]   DSMF ¶ 71; PRDSMF ¶ 71.

---

[93]     Lantmännen interposes a qualified response to PSAMF ¶ 119 on the ground that as "a Zone Manager, Mr. Lutes did not have the same sales responsibilities as his numbers reflect the group's performance."  DRPSAMF ¶ 119.  For the reasons explained earlier, the Court is allowing Ms. Tucker to present evidence of comparable salespeople, even though each salesperson might not be exactly comparable to her.  The Court disregards the remainder of DRPSAMF ¶ 119 as argumentative.  The Court does not accept Lantmännen's qualified response.

[94]     Even though Lantmännen admits PSAMF ¶ 120, it still explains why it did not discipline Mr. Lutes.  DRPSAMF ¶ 120.  The Court has not considered Lantmännen's explanation since it is beyond the scope of PSAMF ¶ 120.

[95]     Lantmännen interposes a qualified response to PSAMF ¶ 121 on the ground that even though Mr. Hoffmann did accurately testify that he terminated Mr. Mangano. in 2019 for poor sales performance, Mr. Lutes terminated Mr. Stoops for poor sales performance as well.  DRPSAMF ¶ 121. The Court does not accept Lantmännen's explanation since it is beyond the scope of PSAMF ¶ 121 and the Court declines to accept Lantmännen's qualified response.

[96]     DSMF ¶ 71 states:

   Ms. Embry testified that she was brought in by Mr. Lutes to "clean up the territory for mid-Atlantic" following the departures of Plaintiff and J.S.

DSMF ¶ 71.  Ms. Tucker interposes a qualified response to DSMF ¶ 71 on the ground that she was the Northeast Regional Sales Manager.  PRDSMF ¶ 71.  The Court agrees that the phrasing of DSMF ¶ 71 is misleading because it implies that Mr. Lutes' "clean up" comment applied to both Mr. Stoops and

Ms. Embrey worked for Lantmännen from January 2020 through July 2021 as the Mid-Atlantic Regional Sales Manager.  PSAMF ¶ 130; DRPSAMF ¶ 130.  During Ms. Embrey's interview, Mr. Hoffmann commented, "You're no spring chicken, how long do you plan to work?"[97]  PSAMF ¶ 131; DRPSAMF ¶ 131.  Ms. Embrey also testified that Mr. Hoffmann, during staff sales meetings, would treat female salespersons less favorably than male salespersons.[98]  PSAMF ¶ 146; DRPSAMF ¶

---

Ms. Tucker.  The Court reviewed Ms. Embrey's deposition testimony and has altered the paragraph to be consistent with the record.

[97]     Lantmännen denies PSAMF ¶ 131, marshalling a variety of arguments in support.  It first contends that Mr. Hoffmann denied this allegation.  DRPSAMF ¶ 131 (citing *Hoffmann Dep.* at 35:11-16).  According to Lantmännen, "Mr. Hoffmann further testified that anytime he spoke to employees about their age or how long they intended to work, it was so the company could prepare for their retirement years in advance."  *Id.* (citing *Hoffmann Dep.* at 35:14-25).  Lantmännen continues, "[t]he First Circuit has stated that '[a]n employer may legitimately inquire about an employee's plans so that it can prepare to meet its hiring needs.'"  *Id.* (second alteration in original) (quoting *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 28-29 (1st Cir. 1995)).  Lantmännen goes on to argue that one of Ms. Tucker's witnesses, Ms. Bryant, testified that she did not hear Mr. Hoffmann make this comment or ageist comments in general.  *Id.* (citing *Bryant Dep.* at 17:22-24; 41:16-20).  Finally, Lantmännen claims this allegation is irrelevant because it hired Ms. Embrey, who is older than Ms. Tucker.  *Id.*

     The Court rejects Lantmännen's denial.  First, although Lantmännen correctly cites *Greenberg* for the proposition that an employer may inquire at the hiring stage about an employee's retirement plans, the facts here, as described by Ms. Embrey, place Mr. Hoffmann's inquiry into a different category.  By prefacing his inquiry with the comment about Ms. Embrey being "no spring chicken," a jury could find that Mr. Hoffmann was expressing a discriminatory attitude toward older employees.  Moreover, as Mr. Hoffmann was interviewing on behalf of Lantmännen, a jury could impute his comment to Lantmännen.  As regards Lantmännen's marshaling of countervailing evidence, the Court is required to view conflicting evidence in the light most favorable to Ms. Tucker, and therefore the Court does not consider it.

[98]     Lantmännen interposes a qualified response to PSAMF ¶ 146.  Lantmännen admits that Ms. Embrey "testified that she subjectively felt that Mr. Hoffmann treated men more favorably during sales meetings."  DRPSAMF ¶ 146.  Lantmännen points out, however, that "Ms. Embrey also did not overlap her employment with Plaintiff at all and has no knowledge of Plaintiff's sales performance nor knowledge of the reasons for Plaintiff's discharge."  *Id.*  Citing *Goff v. Continental Oil Co.*, 678 F.2d 593, 596-97 (5th Cir. 1982), and *Hester v. BIC Corp.*, 225 F.3d 178, 184 (2d Cir. 2000), Lantmännen argues that Ms. Embrey's "personal experiences occurred after Plaintiff's discharge and are of minimal relevance."

     The Court rejects Lantmännen's qualified response.  Neither cited case is persuasive.  In *Goff*, the Fifth Circuit upheld the exclusion of testimony of employees who had never worked in the plaintiff's department and whose testimony did not concern the same supervisors of whom the plaintiff complained.  678 F.2d at 596-97.  Here, Ms. Embrey worked as the Mid-Atlantic Regional Sales Manager and testified about her dealings with Mr. Hoffmann, who was Director of Sales at Lantmännen and supervised both Ms. Tucker and Ms. Embrey.  In *Hester*, the Second Circuit held that testimony of co-employees that the employer's decisions about the plaintiff must have been due to her race was inadmissible because their testimony was based on "the witnesses' subjective

146.  Ms. Embrey recounted how Mr. Hoffmann would allow male salespersons to speak at length and say anything they wanted, but would cut off Ms. Embrey every time she spoke.[99]  PSAMF ¶ 147; DRPSAMF ¶ 147.  Mr. Hoffmann would also praise and congratulate male salespersons when they presented ideas for sales, but he would treat Ms. Embrey's ideas with indifference.[100]  PSAMF ¶ 148; DRPSAMF ¶ 148.

On July 21, 2021, Ms. Embrey set up a broker training to present some bread products, which Mr. Hoffmann attended.  PSAMF ¶ 149; DRPSAMF ¶ 149.  Toward the end of the training, Mr. Hoffmann complained that some of the bread products were dry.  PSAMF ¶ 150; DRPSAMF ¶ 150.  Mr. Hoffmann then "picked up a loaf of bread" and "rifled" it in the direction of Ms. Embrey.  PSAMF ¶ 151; DRPSAMF ¶ 151.  The bread "landed on the table against [Ms. Embrey's] arm."  PSAMF ¶ 151; DRPSAMF ¶ 151.  The brokers were taken aback. PSAMF ¶ 151; DRPSAMF ¶ 151.  Mr. Hoffmann then abruptly ended the presentation.[101]  PSAMF ¶ 151; DRPSAMF ¶ 151.  Ms. Embrey described the incident as follows:

---

impressions that [the supervisor's] condescension to [the plaintiff] was attributable to [the plaintiff's] race." 225 F.3d at 184.  The Court does not view *Hester* as applicable to the facts in this case, where Ms. Embrey's proposed testimony concerns her direct dealings with Mr. Hoffmann.

[99]    Lantmännen interposes a qualified response to PSAMF ¶ 147, reiterating its arguments in response to PSAMF ¶ 146.  DRPSAMF ¶ 147.  The Court declines to accept the qualified response for the reasons set forth in the preceding footnote.

[100]    Lantmännen interposes a qualified response to PSAMF ¶ 148, again rehashing its arguments in response to PSAMF ¶ 146.  DRPSAMF ¶ 148.  The Court declines to accept the qualified response for the reasons set forth in footnote 98 above.

[101]    Lantmännen interposes a qualified response to PSAMF ¶ 151, noting that it "has no knowledge of this incident occurring and Ms. Embrey never reported it to Human Resources."  DRPSAMF ¶ 151 (citing *Komerska Dep.* at 21:12-25).  The Court declines to accept Lantmännen's qualified response.  The admissibility of Ms. Embrey's testimony does not depend on whether Lantmännen was aware of the incident or whether Ms. Embrey reported the incident to Human Resources.

I've been in this industry a long time. I have never had anybody treat me like that. I do not know how to process this. I do not know what just happened.[102]

PSAMF ¶ 152; DRPSAMF ¶ 152. After the bread-throwing incident, Mr. Hoffmann, Mr. Lutes, and Ms. Embrey met, during which Mr. Hoffmann complained, "I don't know what you just did in there but that was horrible." PSAMF ¶ 153; DRPSAMF ¶ 153. In response, Ms. Embrey defended herself, telling Mr. Hoffmann, "I did exactly what I was told by Greg [Lutes]."[103] PSAMF ¶ 154; DRPSAMF ¶ 154. Later that day, a broker who attended the training called Ms. Embrey and asked, "Val, are you okay? . . . Who the "F" is that guy, you work for him? We are supposed to sell his products after he just visibly treated you like that – in front of all of us?"[104] PSAMF ¶ 155; DRPSAMF ¶ 155. Ms. Embrey then spoke to other brokers who attended the meeting, who stated, "Holy crap, what kind of jackass is this guy you work for?"[105] PSAMF ¶ 156; DRPSAMF ¶ 156.

---

[102]    Lantmännen interposes a qualified response to PSAMF ¶ 152 on the same basis as it qualified its response to PSAMF ¶ 151. DRPSAMF ¶ 152. The Court declines to accept Lantmännen's qualified response to PSAMF ¶ 152 for the reasons explained in the preceding footnote.

[103]    PSAMF ¶ 154 reads: "In response, [Embrey] defended herself, telling Hoffman[n], 'I don't exactly what I was told by Greg.'"

Lantmännen interposes a qualified response to PSAMF ¶ 154. First, Lantmännen notes that it "appears Plaintiff left out certain words of Ms. Embrey's testimony, so it is difficult to decipher what Plaintiff is stating as fact." DRPSAMF ¶ 154. Lantmännen then clarifies, "What Ms. Embrey stated was that Mr. Hoffmann asked her why she brought so much bread to the showing and Ms. Embrey responded, 'Ralph, I brought exactly what Greg asked me to bring, six to eight pieces of each bread.'" *Id.* (citing *Stipulated R.*, Attach. 62, *Dep. of Valerie Embrey* at 33:20-34:2 (*Embrey Dep.*)). The Court agrees with Lantmännen that PSAMF ¶ 154 contains a typographical error. The Court found Ms. Embrey's relevant testimony, *see Embrey Dep.* at 33:18-19 ("I did exactly what I was told by Greg"), and the Court corrected the typographical error to conform with the record.

[104]    Lantmännen interposes a qualified response to PSAMF ¶ 155 on the same basis as it qualified its response to PSAMF ¶ 151. DRPSAMF ¶ 155. The Court declines to accept Lantmännen's qualified response to PSAMF ¶ 155 for the reasons explained in footnote 101 above.

[105]    Lantmännen interposes a qualified response to PSAMF ¶ 156 on the same basis as it qualified its response to PSAMF ¶ 151. DRPSAMF ¶ 156. The Court declines to accept Lantmännen's qualified response to PSAMF ¶ 156 for the reasons explained in footnote 101 above.

The next day, Mr. Lutes called Ms. Embrey to see if she was okay, during which Ms. Embrey relayed, "I have no words. I have been in this industry for over thirty years. I have a great reputation in this industry, and they have all loved working with me, and they all knew I was very enthusiastic, excited to work for this company."[106] PSAMF ¶ 157; DRPSAMF ¶ 157. In this phone call, Mr. Lutes and Ms. Embrey also agreed, "Okay, so let's just move forward."[107] PSAMF ¶ 158; DRPSAMF ¶ 158.

A couple of days later, Mr. Hoffmann called Ms. Embrey to inform her that "the company has decided to take a different direction. Your job position as mid-Atlantic regional manager is being eliminated. So, we have no more need for your services." PSAMF ¶ 159; DRPSAMF ¶ 159. At the time of the bread-throwing incident, Ms. Embrey's sales numbers were up, and she had just landed some big deals.[108] PSAMF ¶ 160; DRPSAMF ¶ 160. On the day of her termination, Ms. Embrey called Ms. Komerska to report the bread-throwing incident and her subsequent termination.[109]

---

[106]  Lantmännen interposes a qualified response to PSAMF ¶ 157. DRPSAMF ¶ 157. Lantmännen admits that "Ms. Embrey testified about a phone call with Mr. Lutes wherein she complained about Mr. Hoffmann's criticism of her performance during a sales call. *Id.* However, Lantmännen notes that Ms. Embrey's employment did not overlap with Ms. Tucker's and, as such, it contends that Ms. Embrey's experiences are of minimal relevance. *Id.* The Court overrules Lantmännen's qualified response for the reasons it set forth in footnote 98 above.

[107]  Lantmännen admits that "Mr. Lutes told Ms. Embrey to move forward" but says that the comment was "in relation to the poor sales call, not to Mr. Hoffmann throwing bread at her." DRPSAMF ¶ 157. The Court rejects Lantmännen's qualified response because it is required to view conflicting evidence in the light most favorable to Ms. Tucker.

[108]  Lantmännen denies PSAMF ¶ 160 because it denies that the bread-throwing incident occurred. DRPSAMF ¶ 160. Lantmännen further states that it "decided to separate Ms. Embrey prior to that sales presentation due to a COVID-related slump in sales." *Id.* (citing *Komerska Dep.* at 23:2-24:3; and *Hoffmann Dep.* at 37:14-16). The Court declines to accept Lantmännen's denial because it is required to view contested evidence in the light most favorable to Ms. Tucker.

[109]  Lantmännen denies PSAMF ¶ 161 on the ground that Ms. Embrey "never said anything about bread throwing when she spoke to Ms. Komerska." DRPSAMF ¶ 161 (citing *Komerska Dep.* at 21:19-25). The Court declines to accept Lantmännen's denial because it is required to view contested evidence in the light most favorable to Ms. Tucker.

PSAMF ¶ 161; DRPSAMF ¶ 161.  During the call, Ms. Komerska did not offer any assistance beyond telling Ms. Embrey that she could send in a letter.[110]  PSAMF ¶ 162; DRPSAMF ¶ 162.

During his October 1, 2021 deposition, Mr. Lutes explained that Lantmännen plans to continue to use one individual to fill the two roles previously held by Ms. Tucker and Mr. Stoops.  DSMF ¶ 72; PRDSMF ¶ 72.  Mr. Lutes remains employed at Lantmännen.[111]  DSMF ¶ 73; PRDSMF ¶ 73.  Ms. Tucker has not worked in any capacity for any employer since December 2019.[112]  DSMF ¶ 75; PRDSMF ¶ 75.

## IV.  THE POSITIONS OF THE PARTIES

### A.  Lantmännen's Motion

#### 1.  Age and Sex Discrimination

In its motion, Lantmännen vigorously denies that it fired Ms. Tucker because of her age or gender and instead it forcefully argues that it terminated her because of her "objective sales performance."  *Def.'s Mot.* at 1-2.  Saying that "[i]n sales, the numbers speak for themselves," Lantmännen insists that there is "nothing

---

[110]  Lantmännen denies PSAMF ¶ 162, asserting that "Ms. Komerska assured Ms. Embrey that she would 'look into the situation.'"  DRPSAMF ¶ 162 (quoting *Komerska Dep.* at 29:5-7).  Lantmännen further said that Ms. Komerska interviewed Mr. Hoffmann, and "Mr. Hoffmann was 'surprised' that Ms. Embrey felt bad that he had told her he was unhappy with her performance."  *Id.* (quoting *Komerska Dep.* at 29:11–30:5).  The Court declines to accept Lantmännen's denial because it is required to view contested evidence in the light most favorable to Ms. Tucker.

[111]  DSMF ¶ 74 asserts that during Ms. Tucker's employment, she never made any complaints about age or gender discrimination to her superiors or Human Resources.  DSMF ¶ 74.  Citing her deposition, Ms. Tucker denies this paragraph, stating that she complained to Mr. Hoffmann about Mr. Lutes' verbal abuse of her.  PRDSMF ¶ 74.  Having reviewed Ms. Tucker's October 8, 2021 deposition, the Court agrees with Ms. Tucker that she testified she complained to Mr. Hoffmann about Mr. Lutes' abusive conduct and, viewing the record in the light most favorable to Ms. Tucker, she did assert that the abuse was either age- or gender-based.  Therefore, the Court declines to include DSMF ¶ 74.

[112]  DSMF ¶ 76 describes Ms. Tucker's alleged wealth; Ms. Tucker objects on the ground of relevance.  PRDSMF ¶ 76.  The Court can conceive of no evidentiary basis for admitting evidence of Ms. Tucker's wealth and declines to include DSMF ¶ 76.

discriminatory about evaluating a salesperson on their sales." *Id.* at 1. To buttress its claim that it fired Ms. Tucker for her poor sales record, Lantmännen points to two factors that it says demonstrate that it did not discriminate against Ms. Tucker based on her age or gender: 1) at the same time it fired Ms. Tucker, Lantmännen fired a younger male salesperson on Ms. Tucker's team, and it retained on that team a female who was older than Ms. Tucker; and 2) to fill these two openings, Lantmännen hired a female who was older than Ms. Tucker. *Id.* at 2.

Lantmännen reviews the standard *McDonnell Douglas*[113] three-step burden-shifting analysis that Maine courts use in employment-discrimination cases at the summary judgment stage. *Id.* at 4-6. Lantmännen first suggests that Ms. Tucker cannot establish a prima facie case of gender or age discrimination, and therefore her claims must fail at the first step of the analysis. *Id.* at 6-10. Lantmännen cites Ms. Tucker's "woeful sales figures" and asserts that she "cannot meet her burden of proving that she was adequately performing her job." *Id.* at 6. Lantmännen concedes that it hired Ms. Tucker in 2017 because of her "prior sales qualifications," but it insists that her qualifications "did not translate to acceptable performance." *Id.* Lantmännen then reviews Ms. Tucker's sales figures and concludes that "Mr. Lutes and Mr. Hoffmann fired Plaintiff in December of 2019 following three consecutive years of Plaintiff not meeting her sales goals and a 2019 in which Plaintiff's performance worsened each quarter." *Id.* at 7-8. Lantmännen also focuses on the "final element" of a prima facie case and argues that Ms. Tucker's prima facie case

---

[113]   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-5 (1973).

must fail because "it is undisputed that Lantmännen treated other similarly situated individuals the same as Plaintiff." *Id.* at 8-10. If Ms. Tucker is deemed to have raised a prima facie case, Lantmännen contends that its reasons for firing her were not pretextual. *Id.* at 11-12.

### 2. Negligent Misrepresentation

Lantmännen characterizes as "threadbare" Ms. Tucker's allegations of negligent misrepresentation. *Id.* at 13. After quoting the elements under Maine law for a successful negligent misrepresentation claim, Lantmännen acknowledges that Mr. Minden's denial that he guaranteed Ms. Tucker five years of employment "only carries so much weight at this stage of the litigation." *Id.* But Lantmännen argues that Ms. Tucker's admitted post-offer conduct illustrates why "no rational fact finder could find that the offer ever really existed." *Id.* In essence, Lantmännen contends that Ms. Tucker's signing the written offer letter and reviewing the Employee Handbook dispel any claim that Lantmännen made a side-offer guaranteeing five-years employment to her. *Id.* at 13-16.

### B. Rinda Tucker's Opposition

#### 1. Age Discrimination

##### a. The Prima Facie Case

In her opposition, Ms. Tucker discusses first her age discrimination claim. *Pl.'s Amended Opp'n* at 8-17. Noting that Lantmännen's motion focuses on whether she met its employment expectations and whether it subsequently filled the position, Ms. Tucker addresses the second and fourth elements of the prima facie case. *Id.* at 8-11.

Turning to the second element—whether she met Lantmännen's "job performance expectations"—Ms. Tucker points first to her nearly thirty years of success in the food-service industry, including commendations at Lantmännen for her job performance. *Id.* at 8-9. Ms. Tucker emphasizes that Lantmännen may not present evidence of its alleged nondiscriminatory reason for terminating her during the prima facie part of the analysis and therefore contends that the Court should not consider evidence of Ms. Tucker's alleged poor sales at this stage. *Id.* at 9-10.

Regarding the fourth element—whether her duties were assumed by others—Ms. Tucker argues that as Lantmännen hired Valerie Embrey to assume her responsibilities, she has met this element. *Id.* at 10. Ms. Tucker also rejects Lantmännen's argument that she cannot meet the fourth element because Ms. Embrey is older than Ms. Tucker. *Id.* at 10-11.

### b.    Legitimate Non-Discriminatory Reason

Ms. Tucker concedes that Lantmännen produced a legitimate, non-discriminatory reason for her termination, namely poor sales. *Id.* at 11.

### c.    Pretext

Ms. Tucker maintains that she has raised genuine issues of material fact as to whether her termination was pretextual. *Id.* at 12-17. She maintains that triable issues exist as to whether 1) she had poor sales over the three years of her employment, 2) Lantmännen's articulated reason for her termination is inconsistent with her actual performance, 3) Lantmännen deviated from its established policy by not adhering to progressive discipline, 4) Lantmännen articulated varying and

inconsistent reasons for her termination, 5) Greg Lutes and Ralph Hoffmann made false statements about her job performance, (6) Lantmännen failed to discipline other male salespersons in 2019 whose sales were equal to or worse than Ms. Tucker's, and (7) Lantmännen failed to discipline male salespersons in 2017 and 2018 who failed to meet their sales goals. *Id.* at 12-17. Ms. Tucker also points to evidence of age animus at Lantmännen. *Id.* at 17. Taken together, Ms. Tucker argues that she has raised genuine issues of material fact on her age discrimination claim that can be resolved only by a jury.

### 2. Gender Discrimination Claim

#### a. The Prima Facie Case

As with her age discrimination claim, Ms. Tucker focused on the second and fourth elements of the prima facie case for her sex discrimination claim. *Id.* at 18. Regarding the second element, Ms. Tucker relies on her prior arguments in support of her age discrimination claim. *Id.* Ms. Tucker again maintains that she has satisfied the fourth element by demonstrating that Lantmännen filled her position after she was terminated. *Id.*

#### b. Pretext

Ms. Tucker relies on her arguments concerning her age discrimination claim to demonstrate that Lantmännen's termination of her was pretextual. *Id.* at 18. Ms. Tucker adds that gender discrimination within the food-service industry is systemic. *Id.* at 19. In support of this assertion, Ms. Tucker points to the comments of Mr.

Hoffmann and the way he treated female salespeople. *Id.* Ms. Tucker also refers to Mr. Lutes' treatment of her, yelling at her and making demeaning comments. *Id.*

### 3. Negligent Misrepresentation

In her opposition to Lantmännen's motion for summary judgment on Count III, the negligent misrepresentation count, Ms. Tucker says that the "summary judgment record contains evidence that Minden, in the course of his employment, offered Tucker employment contingent on her agreeing to remain employed for five years." *Id.* at 19. Ms. Tucker writes that she "justifiably relied" on Mr. Minden's representation and accepted Lantmännen's offer. *Id.* at 19-20. Ms. Tucker insists that when Lantmännen provided her the paperwork to join the company, "Minden's offer proved to be false," which Ms. Tucker contends "states a case of negligent misrepresentation." *Id.* at 20.

### C. Lantmännen's Reply

### 1. Age and Gender Discrimination

In reply, Lantmännen says that based on uncontroverted facts, it is entitled to summary judgment on Ms. Tucker's age and gender discrimination claims. *Def.'s Amended Reply* at 1-6. Lantmännen points to the following facts it says are undisputed: 1) Ms. Tucker failed to meet her sales goals from 2017 through 2019; 2) Lantmännen fired younger male salespeople who failed to meet their sales goals; 3) the only person Lantmännen retained on Ms. Tucker's sales team was an older female; and 4) Lantmännen replaced Ms. Tucker with an older female. *Id.* at 1.

Lantmännen discusses *Bhatti v. Trustees of Boston University*, 659 F.3d 64 (1st Cir. 2011), and argues that *Bhatti* highlights why Ms. Tucker's similarly situated worker argument must fail. *Id.* at 2. Regarding Ms. Tucker's allegation that she was treated worse than male workers, Lantmännen asserts that criticism of one's job performance "is not actionable." *Id.* at 3. Lantmännen then reiterates its position that Ms. Tucker "did not successfully perform her job at the time of her discharge." *Id.* at 4. Lantmännen argues that Ms. Tucker's performance "plunged" in 2019 when she had her "worst performing year based on the dollar amount that she missed her sales target by ($699,394) and the percentage she underperformed by (10.8%)." *Id.* at 5. Lantmännen also notes that it had issued "multiple warnings about her poor performance." *Id.* Finally, Lantmännen accuses Ms. Tucker of misrepresenting the performance of other sales personnel. *Id.* at 5-6.

### 2.     Negligent Misrepresentation

Lantmännen argues that Ms. Tucker has offered no support for her negligent misrepresentation claim "because there is none." *Id.* at 7. Despite Ms. Tucker's affidavit, Lantmännen maintains that its evidence demonstrates "that no rational person in Plaintiff's situation could have believed they had a five-year employment guarantee." *Id.*

## V.     LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could

resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## VI.   DISCUSSION[114]

To assess a motion for summary judgment on the issue of causation in an employment discrimination case, Maine courts have applied the "three-step, burden-shifting analysis articulated in *McDonnell Douglas*." *Trott v. H.D. Goodall Hosp.*, 66 A.3d 7, 13 (Me. 2013) (citation omitted).  In *Trott*, the Maine Supreme Judicial Court described the framework:

> (1)  the employee bears the initial burden to produce evidence that unlawful discrimination motivated the employer's adverse employment action against the employee;
>
> (2)  if the employee meets that burden, the burden shifts to the employer to produce evidence of a legitimate, lawful reason for the adverse employment action; and
>
> (3)  if the employer meets that burden, the burden shifts back to the employee to produce evidence that the employer's proffered reason is a pretext to conceal an unlawful reason for the adverse employment action.

*Id.* (citing *Fuhrmann v. Staples the Office Superstore East, Inc.*, 58 A.3d 1083, 1089 (Me. 2012)).

### A.   The Maine Human Rights Act: Age Discrimination

The Maine Human Rights Act (MHRA) "prohibits employers from discharging and otherwise discriminating against employees because of their age."  *Costa v. Cumberland Farms, Inc.*, No. 2:12-cv-00378-JDL, 2014 U.S. Dist. LEXIS 152859, at

---

[114]   "Maine courts have used federal precedent surrounding Title VII for the purposes of construing and applying the provisions of the MHRA."  *Cole v. State of Maine, Off. of Info. Tech.*, 1:17-cv-00071-JAW, 2018 U.S. Dist. LEXIS 163857, at *64-65 (D. Me. Sept. 25, 2018) (citing *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1053 (Me. 1992)); *see Watt v. UniFirst Corp.*, 969 A.2d 897, 903 n.4 (Me. 2009) ("It is appropriate to look to analogous federal case law for guidance in the interpretation of the [MHRA]").

*53 (D. Me. May 31, 2014), *rejected in part on other grounds*, 2014 U.S. Dist. LEXIS 151460 (D. Me. Oct. 23, 2014) (citing 5 M.R.S. § 4572(1)(A)).

### 1.  Reduction in Force

"The elements of the prescribed prima facie case vary, within the age discrimination context, depending upon whether or not the plaintiff was dismissed as part of a reduction in force." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993).  "If there was no reduction in force, the plaintiff establishes the prima facie case by demonstrating that [she] '(1) was at least forty years of age,[115] (2) met the employer's legitimate job performance expectations, (3) experienced adverse employment action, and (4) was replaced by a person with roughly equivalent job qualifications.'" *Id.* (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1117 (1st Cir. 1993)).  "If the employer dismissed the plaintiff as part of a reduction in force, the plaintiff 'need not show replacement by someone with equivalent job qualifications.  Instead, to satisfy element (4), the plaintiff may demonstrate either that "the employer did not treat age neutrally or that younger persons were retained in the same position."'" *Hidalgo v. Overseas Condado Ins. Agencies, Inc.*, 120 F.3d 328, 333 (1st Cir. 1997) (quoting *LeBlanc*, 6 F.3d at 842 (quoting *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1111 (1st Cir. 1989))).  Here, the record confirms that

---

[115]    The Court uses this formulation to explain the reduction of force factor.  The Court is aware that the Maine Supreme Judicial Court has held that, unlike its federal counterpart, the MHRA does not impose the forty-year-old requirement for an age discrimination claim.  *Scamman v. Shaw's Supermarkets, Inc.*, 157 A.3d 223, 233 (Me. 2017); *Me. Hum. Rts. Comm'n ex rel. Kellman v. Dep't of Corr.*, 474 A.2d 860, 864 n.4 (Me. 1984); *Me. Hum. Rts. Comm'n ex rel. Trudel  v. Kennebec Water Power Co.*, 468 A.2d 307, 310 (Me. 1983) (noting that the MHRA "extends the protection afforded by the federal statute by declining to create a limited, specially protected age group").  As Ms. Tucker was over forty years old during her employment at Lantmännen, this distinction between federal and Maine law is immaterial.

Lantmännen did not terminate Ms. Tucker as part of a reduction in force. Indeed, in her place, shortly after firing Ms. Tucker, Lantmännen hired Valerie Embrey. DSMF ¶ 70. Accordingly, the Court applies to Ms. Tucker's claim of age discrimination the four elements set forth in *LeBlanc*, which apply when there is no reduction in force.

### 2.    The Prima Facie Case

The Court turns to whether Ms. Tucker has established a prima facie case of age discrimination. The parties do not dispute that Ms. Tucker demonstrated she was a member of a protected class[116] at the time of her termination and that she was fired, thus satisfying the first and third elements of a prima facie case. *See LeBlanc*, 6 F.3d at 842. Instead, the parties primarily focus on whether she met her employer's job performance expectations.

Lantmännen insists that Ms. Tucker never did her job well. *Def.'s Amended Reply* at 1 ("Plaintiff failed to meet her sales goals from 2017-2019"). The record reveals facts that would allow a jury to conclude otherwise. Lantmännen hired Ms. Tucker on April 1, 2017, and Mr. Minden naturally told her that sales goals for the entire year would not apply to her. DSMF ¶ 35; PSAMF ¶¶ 18-19. Nevertheless, Ms. Tucker increased sales and at the October 2017 executive team meeting, Mr. Hoffmann praised her for "stopp[ing] the bleeding." PSAMF ¶ 22. By the end of the year, Ms. Tucker's annual evaluation graded out to a 3.4 average between "good" and "very good." PSAMF ¶ 23.

---

[116]    The MHRA does not contain an age restriction. *See supra* n.115.

The same is true for 2018.  Ms. Tucker increased sales by $350,000 and landed Ocean Properties, an account Lantmännen had lost five years earlier.  PSAMF ¶¶ 40-41.  Indeed, Scott Kolinski, Lantmännen's president, gave Ms. Tucker a bonus, PSAMF ¶ 41, and her 2018 evaluation stated in bold: "**Rinda did achieve her 2018 sales goal**."  PSAMF ¶ 42 (emphasis in original).  Moreover, when Mr. Minden left employment with Lantmännen in January 2019, Jolien Demeyer, Lantmännen's Senior Category and Digital Marketing Manager, highly recommended to Mr. Kolinski that Ms. Tucker take Mr. Minden's place.  PSAMF ¶ 59.  While Lantmännen's assertion that Ms. Tucker did not meet her sales goals for 2017 and 2018 may be technically correct, the record raises a factual question as to whether Ms. Tucker was meeting Lantmännen's job performance expectations from April 2017 through December 2018.

It is true Ms. Tucker acknowledged that her sales in 2019 were "not good" as of November 2019.  DSMF ¶ 54.  Ms. Tucker's sales target for 2019 was $6,501,310 and her actual sales were $5,801,916, a shortfall of $699,394.  DSMF ¶ 43.  According to Ms. Tucker, one reason for the shortfall was that a major client filed for Chapter 11 protection.  PSAMF ¶ 82.  A second was that Lantmännen had increased her sales goal from $5,939,739 in 2018 to $6,501,310 in 2019.  DSMF ¶¶ 42-43.  In fact, Ms. Tucker had increased sales from $5,776,412 in 2018, when Lantmännen had given her a bonus and stated in its evaluation that she met her sales goal, to $5,801,916, when her sales performance was grounds for termination.  DSMF ¶¶ 42-43.  Just six days before her termination, Ms. Tucker landed a new customer, prompting Mr.

Hoffmann to email her for doing a "great job."  PSAMF ¶ 81.  Just prior to her termination, Ms. Tucker's sales were on the upswing, and she had just signed up a new major account.  PSAMF ¶ 89.  Further, Lantmännen's overall sales in 2019 were below target.  PSAMF ¶ 67.  Lantmännen's July 2019 executive meeting minutes reflect the company's concern about soft sales in "all areas," singling out the southeast as having the "[s]trongest declines," and noting that Lantmännen's "[c]ore business is eroding."  *Id.*  Given these cumulative factors, the Court concludes that there are factual issues about whether, as Lantmännen claims, Ms. Tucker's job performance was poor in 2019.[117]

This Court recognizes that it does not, as the First Circuit has written, sit as a "super personnel department[]," *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991), and Lantmännen's "decision to adopt a new sales quota is a business decision that [a court] may not question in an employment discrimination case," *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 53 (1st Cir. 2010).  Here, the Court is discussing not Lantmännen's setting of the sales quota, which it has every right to do, but whether Lantmännen equally enforced its sales quotas over its salesforce and applied the same discipline when male salespeople failed to meet their sales goals.

Relatedly, another factual question for resolution by a jury is whether Lantmännen terminated other salespeople for missing their sales goals for one year.

---

[117]    Lantmännen relies heavily on *Bhatti v. Trustees of Boston University*, 659 F.3d 64 (1st Cir. 2011).  After reviewing *Bhatti*, the Court views it as dissimilar to Ms. Tucker's case.  As the *Bhatti* Court discussed, much of the comparable evidence upon which the plaintiff was relying to demonstrate disparate treatment was either inadmissible or neutral.  *See Bhatti*, 659 F.3d at 71-73 (discussing "now discounted evidence" and evidence that did not demonstrate racial disparity).

Here, the record reveals that Lantmännen did not terminate or discipline Eric Ingraham in 2017, PSAMF ¶¶ 24-25, Anthony Mangano in 2017, PSAMF ¶¶ 26-27, Drew Wilson in 2017, PSAMF ¶¶ 28-29, John Stoops in 2017, PSAMF ¶¶ 30-31, Timothy Decker in 2017, PSAMF ¶¶ 32-33, Brian Davel in 2017, PSAMF ¶¶ 34-35, Frank Swindle in 2017, PSAMF ¶¶ 36-37, or Greg Lutes (assuming the Lantmännen spreadsheet is correct) in 2017, PSAMF ¶¶ 38-39.

The same pattern exists for 2018. Lantmännen did not discipline or terminate Anthony Mangano for his 2018 shortfall, PSAMF ¶¶ 43-44, John Stoops for his, PSAMF ¶¶ 45-46, Timothy Decker for his, PSAMF ¶¶ 47-48, Brian Davel for his, PSAMF ¶¶ 49-50, Frank Swindle for his, PSAMF ¶¶ 51-52, or Greg Lutes (again assuming the Lantmännen spreadsheet is accurate) for his, PSAMF ¶¶ 53-54. At this point, Mssrs. Mangano, Stoops, Decker, Davel, Swindle, and (perhaps) Lutes had each missed their sales goals for two years running and Lantmännen took no action against them.

This same pattern continued in 2019. Fourteen out of fifteen salespersons failed to meet their sales goals in 2019. PSAMF ¶ 86. Ms. Tucker's immediate boss, Greg Lutes, missed his 2019 sales goal by $848,689, but he participated in the firing of Ms. Tucker, when she missed her goal by $699,394. PSAMF ¶ 87. Mr. Wilson and Mr. Ingraham both missed their sales goals and were not disciplined or terminated. PSAMF ¶¶ 113-16. Mr. Ingraham fell $748,121 short of his goal, almost $50,000 more than Ms. Tucker. PSAMF ¶ 115.

Lantmännen has some explanations for this cumulative evidence. First, it claims that none of the other salespersons is comparable. *See, e.g.*, DRPSAMF ¶ 25. But, as the Court noted, even if other salespersons are not comparable in some respects, this could not mean that all salespersons working for the same company selling the same products are incomparable in all respects. In other words, the rest of Lantmännen's salesforce could not all be so dissimilar to Ms. Tucker as to present no factual issue before a jury as to its comparability.

Next, Lantmännen protests that it terminated Mr. Mangano and Mr. Stoops in 2019. DSMF ¶¶ 65-67. True, but by 2019, a jury could find that Mr. Mangano and Mr. Stoops had each failed to meet his sales goals three years running, and Lantmännen did not discipline or terminate any other salespeople who consistently failed to meet their sales goals. While a jury could find, based on the numbers presented by Lantmännen, that Ms. Tucker fell within this same category of salespeople who failed to meet their quotas for three years in a row, the record would also allow a conclusion that Lantmännen viewed Ms. Tucker as meeting its job expectations until 2019 and therefore fired her for only one year of poor sales.

Assuming a jury could find that Lantmännen treated Ms. Tucker more harshly than other salespeople by firing her after one year of disappointing results, the Court turns to whether there is evidence that Lantmännen's apparently disparate treatment of Ms. Tucker was based on her age. The record reflects that Mr. Hoffmann and Mr. Lutes were the ones who made the decision to fire Ms. Tucker. DSMF ¶ 57. The record also contains evidence of age-related comments by Mr. Hoffmann to Ms.

Tucker and Ms. Embrey. *See Domínguez-Cruz v. Suttle Caribe, Inc.*. 202 F.3d 424, 433 (1st Cir. 2000) ("[E]vidence of age-related comments could support an inference of pretext and discriminatory animus"). On or about July 8, 2019, Mr. Hoffmann told Ms. Tucker, "You're getting older, the kids are grown . . . now that your kids are grown and you are getting older, maybe the job is too much for you." PSAMF ¶ 127. On or about August 12, 2019, Mr. Hoffmann told Ms. Tucker, "You are getting older, and maybe you are slowing down." PSAMF ¶ 128. On or about August 28, 2019, Mr. Hoffmann said, "We need to clean house and get young blood." PSAMF ¶ 129. During Ms. Embrey's interview in December 2019, Mr. Hoffmann commented, "You're no spring chicken, how long do you plan to work." PSAMF ¶ 131.

The last element is of a prima facie case is whether Lantmännen hired a replacement who had roughly equal job qualifications. The record reflects that Ms. Embrey fits within that criterion. Although Lantmännen protests that Ms. Embrey was older than Ms. Tucker, the record also reflects that by the summer of 2021, Lantmännen fired Ms. Embrey too. PSAMF ¶ 159. This was directly after an unusual incident where Mr. Hoffmann picked up a loaf of bread and rifled it at Ms. Embrey, nearly striking her, an action consistent with a deep-seated animus. PSAMF ¶¶ 150-56.

These age-related comments and inappropriate conduct by Mr. Hoffmann are significant because Mr. Hoffmann was one of two individuals who decided to fire Ms. Tucker. *See Vesprini v. Shaw Contract Flooring Servs., Inc.*, 315 F.3d 37, 42 (1st Cir. 2002) (finding that age-related comments must be made by a decisionmaker of record

to serve as direct evidence of age-based animus).  Furthermore, Mr. Hoffmann made the age-related comments to Ms. Tucker in the summer of 2019, within a few months of deciding to fire her, and he made the "no spring chicken" comment to Ms. Embrey nearly contemporaneously with his decision to terminate Ms. Tucker.

Just as a lack of temporal proximity weakens the link between comments and an adverse action, a tight temporal proximity heightens the connection.  *Id.* at 41-42; *McLaughlin v. City of Bangor*, No. 1:20-cv-00158-JDL, 2022 U.S. Dist. LEXIS 10623, at *13 (D. Me. Jan. 13, 2022) ("These statements must have a temporal relationship to the challenged employment action to support a reasonable inference that there existed a causal relationship between the remarks and the subsequent decisionmaking by the employer") (internal quotation omitted).  Finally, while one or two of these age-related remarks might be considered "stray workplace comments," here, the Court concludes that a jury is the proper factfinder to determine whether the comments were stray or significant.

In addition, Lantmännen has a progressive discipline policy, which includes coachings, verbal warnings, written warnings, suspensions, and final warnings.  PSAMF ¶ 7.  Lantmännen also, however, retains the right to "immediately discharge" an employee for "unsatisfactory job performance."  DSMF ¶ 28.  Ms. Tucker was never subjected to gradually escalating corrective action, and Lantmännen had not taken any disciplinary action against her at the time of her termination.  PSAMF ¶ 90.  Strangely, both Mr. Hoffmann and Mr. Lutes testified that they were not aware that Lantmännen had a progressive discipline policy.  PSAMF ¶¶ 91-92.

Even though Lantmännen reserved the right to immediately terminate an employee for unsatisfactory job performance, it presumably has a progressive discipline policy for a reason, and it presented no evidence as to why it did not apply its progressive discipline policy to Ms. Tucker. The only explanation in this record is that neither decisionmaker was aware that a progressive discipline policy existed at Lantmännen, assertions that raise questions that must be resolved by a jury.

In all, the Court concludes that Ms. Tucker has established the elements of a prima facie case against Lantmännen for age-related discrimination in its decision to terminate her employment. *See Dusel v. Factory Mut. Ins. Co.*, 52 F.4th 495, 504 (1st Cir. 2022) ("The Supreme Court has made clear that the first stage of the *McDonnell Douglas* framework is 'not onerous'") (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)); *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 57 (1st Cir. 2018) ("[T]he prima facie case requires only a 'small showing,' one that is 'easily made'") (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003)).

### 3.    Legitimate Business Reason

The Court readily concludes that Lantmännen has presented a legitimate business reason, failing to meet her sales quota, for terminating Ms. Tucker. *See Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 920 (8th Cir. 2000) ("In the context of sales, however, we have indicated that the selling of product is the primary responsibility of a salesperson and thus that sales volume is generally the principal indicator of a salesperson's performance"). Ms. Tucker conceded as much. *Pl.'s Amended Opp'n* at 11.

### 4.   Pretext

"At the final stage of the *McDonnell Douglas* scheme, the burden returns to [the plaintiff] to demonstrate that [the employer's] asserted reasons for [her] termination were pretextual." *Dusel*, 52 F.4th at 506.  "[W]hen a plaintiff seeks to show pretext by debunking the stated reason for the adverse employment action, they must present evidence from which a reasonable jury could supportably conclude 'that the employer's explanation is not just wrong, but that it is so implausible that the employer more likely than not does not believe it.'" *Dusel*, 52 F.4th at 508 (quoting *Forsythe v. Wayfair Inc.*, 27 F.4th 67, 80 (1st Cir. 2022)).   In sustaining this burden, Ms. Tucker "must . . . show, by a preponderance of the evidence . . . 'that age was the 'but-for' cause of the employer's adverse action.'" *Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc.*, 999 F.3d 37, 51 (1st Cir. 2021) (quoting *Vélez v. Thermo King de P.R.*, 585 F.3d 441, 447-48 (1st Cir. 2009)).  At this stage, "the focus should be on the ultimate issue: whether, viewing the 'aggregate package of proof offered by the plaintiff' and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the termination of the plaintiff's employment was motivated by age discrimination." *Domínguez-Cruz*, 202 F.3d at 431 (quoting *Mesnick*, 950 F.2d at 824-25).  Viewing the record in the light most favorable to Ms. Tucker, the Court concludes that there is a triable issue as to whether Lantmännen's asserted reason for Ms. Tucker's termination was pretextual.

First, Lantmännen's explanations for Ms. Tucker's termination are contradictory.  "[W]hen a company, at different times, gives different and arguably

inconsistent explanations, a jury may infer that the articulated reasons are pretextual." *See id.* at 432.  On the one hand, Lantmännen claims that Ms. Tucker's three-year history of failing to meet her sales goals justified her termination. *Def.'s Mot.* at 1 ("For three consecutive years Plaintiff failed to meet her sales goals").  On the other hand, Mr. Minden expressly assured Ms. Tucker in 2017 that her first-year goals would not be held against her because she was starting in April, and Lantmännen evaluated her 2017 performance between good and very good.  Lantmännen's 2018 annual evaluation of Ms. Tucker stated in bold "**Rinda did achieve her 2018 sales goal**."  Six days before her termination, Mr. Hoffmann emailed Ms. Tucker congratulating her for doing a "great job."  Further, Ms. Komerska testified in her deposition that Lantmännen terminated Ms. Tucker "for various reasons."  PSAMF ¶ 91.  This testimony is different from the explanation Lantmännen now advances and, combined with countervailing evidence concerning Ms. Tucker's performance in 2017 and 2018, casts doubt on Lantmännen's claim that Ms. Tucker was terminated for poor performance.

Second, "pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices." *Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 68 (1st Cir. 2008).  Though not typically dispositive, the failure of an employer to follow progressive discipline may be "one of several indicia of pretext." *Venable v. T-Mobile USA, Inc.*, 603 F. Supp. 2d 211, 218 n.8 (D. Me. 2009).  Here, as explained above, Lantmännen failed to follow its progressive discipline policy with respect to Ms. Tucker.

Third, "evidence of age-related comments could support an inference of pretext and discriminatory animus." *Domínguez-Cruz*, 202 F.3d at 433. Here, Mr. Hoffmann, one of the individuals who decided to terminate Ms. Tucker, made several age-related comments to her in the months prior to her dismissal.

Fourth, a jury could view the Lantmännen spreadsheet of sales as evidence of disparate treatment. "The application of a facially neutral policy may constitute disparate treatment where an employer uses the facially neutral policy as a pretext to engage in intentional discrimination." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 271 (1st Cir. 2022). Here, the facially neutral policy is Lantmännen's application of sales goals among its salespeople, allowing some, but not Ms. Tucker, to fail to meet their goals for years running.

In all, the Court concludes that these factors present a jury question as to whether Lantmännen engaged in age discrimination in violation of the MHRA.

## B.    Maine Human Rights Act: Sex Discrimination

To prove a case of sex discrimination under the MHRA, a plaintiff "must present evidence that he or she is a member of a protected class, was qualified for the position at issue, and was adversely treated by the employer based on gender." *Johnson v. York Hosp.*, 222 A.3d 624, 632 (Me. 2019). "If, in the context of summary judgment motion practice, the employee meets the burden of production for 'these three elements, the burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory basis for its action.'" *Id.* (quoting *Daniels v. Narraguagus Bay Health Care Facility*, 45 A.3d 722, 726 (Me. 2012)). "Finally, if the

employer presents such evidence, 'the burden shifts back to the plaintiff to demonstrate that the nondiscriminatory reason is pretextual or irrelevant and that the unlawful discrimination brought about the adverse employment action.'" *Id.* (quoting *Doyle v. Dep't of Hum. Servs.*, 824 A.2d 48, 54 (Me. 2003)). As with the age discrimination claim, the Court has focused, as have the parties, on the second element—whether Ms. Tucker was qualified for the position—and the interrelated last element—whether her termination was based on gender. As a woman, Ms. Tucker is a member of a protected class under the MHRA and as Lantmännen fired her, she was adversely treated.

### 1.    The Prima Facie Case

The Court first addresses whether Ms. Tucker was qualified for her position. Ms. Tucker came to Lantmännen with twenty-eight years of experience in the food industry. PSAMF ¶ 2. Immediately prior to joining Lantmännen, Ms. Tucker worked in sales for a different company in the food service industry. PSAMF ¶ 9. Further, Ms. Tucker did not apply to Lantmännen on her own volition; Lantmännen used a recruiter to contact Ms. Tucker and recruit her to join the company. PSAMF ¶ 11. Viewing this evidence in the light most favorable to Ms. Tucker, the Court easily concludes that a jury could find that she was qualified for her role at Lantmännen.

Turning to whether Ms. Tucker was terminated based on her gender, some evidence applicable to the age discrimination claim also applies here and the Court will not repeat it: 1) Lantmännen's contradictory explanations for its adverse employment action; 2) its deviation from its progressive discipline policy; and 3) its

disparate treatment of Ms. Tucker from the other salespeople.  On this last point, on the sex discrimination claim, it is noteworthy that each of the favored salespeople, who were not disciplined for one year of poor sales performance, was male.

Beyond the evidence applicable to the age discrimination claim, Ms. Tucker produced some evidence, based on the opinions of female employees, that the food service industry is male-dominated and unfriendly to females.  PSAMF ¶¶ 133-34. Turning to Mr. Hoffmann, one of the two decisionmakers, there is evidence in the record that he harbored discriminatory animus toward women.  During sales meetings, Mr. Hoffmann often interrupted female salespeople, cut their presentations short, and treated their suggestions with indifference.  PSAMF ¶¶ 135-36, 146.  By contrast, Mr. Hoffmann offered encouragement to male employees and praised their sales suggestions.  PSAMF ¶ 137, 147-48.  When Ms. Tucker complained to Mr. Hoffmann about Mr. Lutes and his treatment of her, Mr. Hoffmann failed to take any action.  PSAMF ¶ 140.  Also, there is the unusual bread-throwing incident of July 2021, when Mr. Hoffmann rifled a loaf of bread at Ms. Embrey, which displayed some type of animus that a jury could find was gender-based.  Greg Lutes was the other person at Lantmännen, who made the decision to fire Ms. Tucker. DSMF ¶ 57.  Mr. Lutes had a troubled relationship with Ms. Tucker, and he frequently raised his voice at her.  PSAMF ¶ 70.  Mr. Lutes would yell at Ms. Tucker and make demeaning comments, but Ms. Tucker never heard him speak in that manner to any male salespersons.  PSAMF ¶ 139.

Both Mr. Hoffmann and Mr. Lutes gave false testimony concerning Ms. Tucker. Mr. Hoffmann claimed that beginning in late 2018, Ms. Tucker "lost her drive, her ambition, and that came to the forefront as she said she does not really need to work." PSAMF ¶ 94. But Mr. Hoffmann's assertion is false; from late 2018 until her termination, Ms. Tucker continued to diligently work her accounts and never lost her ambition. PSAMF ¶ 95. Mr. Lutes testified that he had between six and eight discussions with Ms. Tucker about entering her day-to-day activities into the CRM system. PSAMF ¶ 96. Mr. Lutes' assertions also are false as he never had a discussion with Ms. Tucker about entering her day-to-day activities into the CRM system. PSAMF ¶ 97. Indeed, Mr. Lutes conceded that after making a search of Lantmännen's documents, he could find no documentation of any discussions with Ms. Tucker for not making sufficient entries into the CRM system. PSAMF ¶ 107. Mr. Lutes also testified that on five or six occasions he issued and documented to Ms. Tucker "Plans to correct deficiencies." PSAMF ¶ 104. This assertion by Mr. Lutes is also false; he never had a discussion with Ms. Tucker about plans to correct deficiencies. PSAMF ¶ 105.

Taken together, the Court concludes that Ms. Tucker has made out a prima facie case of sex discrimination. As with her age discrimination claim, Ms. Tucker has demonstrated that, when viewed in the light most favorable to her, Lantmännen gave conflicting reasons for her termination, treated her more harshly than similarly situated male salespeople, and deviated from its progressive discipline policy. Ms. Tucker also adduced evidence that Mr. Hoffmann routinely treated male employees

better than female employees and that Mr. Lutes frequently raised his voice to her. Finally, both Mr. Hoffmann and Mr. Lutes lied about their dealings with Ms. Tucker.

As the Court discussed earlier, the bar for a prima facie case is low and the Court concludes, based on all this evidence, that Ms. Tucker has met it.

### 2.    Legitimate Business Reasons

For the same reasons described above, the Court concludes that Lantmännen met its burden of production, demonstrating that it had a legitimate business reason, namely poor sales, for terminating Ms. Tucker.

### 3.    Pretext

Like the age-based claim, the Court concludes that a jury could find that Ms. Tucker has met her burden of demonstrating that Lantmännen's proffered reason for her termination was pretextual with respect to gender discrimination. The evidence demonstrates 1) Lantmännen's contradictory explanations for its adverse employment action, 2) its deviation from its progressive discipline policy, 3) its disparate treatment of Ms. Tucker from male salespeople, 4) male chauvinism within some parts of the food service industry, including Lantmännen, 5) rude and differential treatment of Ms. Tucker and women generally by Mr. Hoffmann and Mr. Lutes, the decisionmakers, and 6) false testimony by Mr. Hoffmann and Mr. Lutes concerning Ms. Tucker's performance as a salesperson at Lantmännen. As discussed earlier, the First Circuit has written that each of these factors would allow a factfinder to draw an inference that Lantmännen's stated reason for Ms. Tucker's termination was pretextual. *See Dusel*, 52 F.4th at 508 ("[W]hen a plaintiff seeks to

show pretext by debunking the stated reason for the adverse employment action, they must present evidence from which a reasonable jury could supportably conclude that the employer's explanation is not just wrong, but that it so implausible that the employer more likely than not does not believe it" (internal quotation omitted)).

The case for gender bias is weaker than for age-related bias.  Nevertheless, Lantmännen's differential treatment of Ms. Tucker when compared with its male salespeople, the male chauvinism of Mr. Hoffmann and Mr. Lutes, Lantmännen's failure to follow its progressive discipline policy, and Mr. Hoffmann and Mr. Lutes' misrepresentations of Ms. Tucker's actual performance, when viewed in the light most favorable to Ms. Tucker, lead to the conclusion that Ms. Tucker has raised a jury question as to whether her termination was gender-based in violation of the MHRA.

### C.    Negligent Misrepresentation

To make out a claim of negligent misrepresentation under Maine law, a plaintiff must prove that the defendant is:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Wuestenberg v. Rancourt*, 226 A.3d 227, 231 n.1 (Me. 2020) (emphasis omitted) (quoting *Rand v. Bath Iron Works Corp.*, 832 A.2d 771, 774 (Me. 2003) (quoting Restatement (Second) of Torts § 552(1) (Am. L. Inst. 1981))).

In *Bradley v. Kryvicky*, 574 F. Supp. 2d 210 (D. Me. 2008), the United States District Court for the District of Maine organized these criteria into four elements: "(1) there was a transaction in which Defendant had a pecuniary interest, (2) Defendant provided false information to Plaintiffs in connection with the transaction, (3) without exercising reasonable care or competence, and (4) Plaintiffs justifiably relied on that false information in that transaction." *Id.* at 221; *see Hirschfeld v. Athena Point Lookout, LLC*, No. 1:18-cv-00203-GZS, 2018 U.S. Dist. LEXIS 191135, at *11-12 (D. Me. Nov. 8, 2018) (using the same four elements).

Even looking at the claim in the light most favorable to Ms. Tucker, the record fails to generate a triable issue of fact on two elements: first, that Lantmännen "supplied false information for [her] guidance," and, second, that Ms. Tucker "justifiably relied" on the information. *See King v. Haddow*, No. Pen-12-39, 2012 Me. Unpub. LEXIS 164, at *1-2 (Me. Dec. 28, 2012) (holding that the failure to present evidence on summary judgment of justifiable reliance is fatal to a negligent misrepresentation claim).

In her statement of material facts, Ms. Tucker describes the interview colloquy with the Lantmännen interviewer, Mike Minden:

> 14. In return for her hire, Minden required Tucker to agree to remain employed with Defendant for a minimum of five years.
>
> 15.  Tucker understood Minden's requirement of employment for five years meant she was assured employment with Defendant for five years.

PSAMF ¶¶ 14-15.  Drilling down to the record citation, Ms. Tucker based these factual assertions on the following statements made by Mr. Minden to her during her

job interview: "I just need you to work for five years" and "give me five years."  *Oct. Tucker Dep.* at 51:10-16.  In her deposition, Ms. Tucker confirmed that she believed Mr. Minden was asking her to commit to work for five years.  *Id.* at 51:17-19.  Again, viewing this interchange in the light most favorable to Ms. Tucker, Mr. Minden's statement conveys the length of employment Lantmännen expected of her, not what she could reasonably expect from Lantmännen.  Ms. Tucker has not explained how an employer's demand that she commit to five years of employment could be reasonably construed as an employer's commitment to employ her for five years.

A recent case illustrates this crucial difference.  In *Oullette v. Francesca's Collections*, No. 2:20-cv-00389-LEW, 2021 U.S. Dist. LEXIS 228940 (D. Me. Nov. 30, 2021), the United States District Court for the District of Maine addressed a job interview where a woman who was four months pregnant expressly asked her interviewer whether if she took the job, she would receive paid maternity leave and she was expressly assured that she would receive paid maternity leave.  *Id.* at *1, *11.  She accepted employment based on that representation.  *Id.* at *11.  After she accepted the job, she learned that she was not eligible for maternity leave, and when she left to give birth, her employer fired her.  *Id.*  When the plaintiff confronted the interviewer about her ineligibility for maternity leave, the interviewer expressed "confusion and surprise" to learn that she was not eligible.  *Id.* at *2.  In *Oullette*, the District Court concluded that the employee's negligent misrepresentation claim must survive a motion to dismiss because "'[t]aken as true, these allegations permit the reasonable inference that Defendant's employee failed to exercise reasonable care in

assuring Plaintiff that she would be eligible for maternity leave." *Id.* at \*11 (internal quotation omitted).

In *Oullette*, the employer made a promise to the plaintiff; here, the employer demanded a promise from the plaintiff. Based on the record here, there was nothing false about Mr. Minden's representation to Ms. Tucker that Lantmännan wanted her to work there for five years, nor could Ms. Tucker justifiably interpret the statement as a promise of five years of employment. Lantmännen is entitled to judgment on Count III, the negligent misrepresentation count.

### D.    Breach of Contract

At oral argument on September 26, 2023, Attorney Loranger confirmed that Ms. Tucker is no longer pursuing her breach of contract claim under Count IV of the Complaint. The Court therefore dismisses Count IV, the breach of contract count, with prejudice.

## VII.    CONCLUSION

The Court GRANTS in part and DENIES in part Lantmännen Unibake USA, Inc.'s Motion for Summary Judgment. The Court GRANTS Lantmännen Unibake USA, Inc.'s Motion for Summary Judgment as to Counts III and IV and DENIES its motion as to Counts I and II.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 14th day of December, 2023